## CLYATT *v.* UNITED STATES.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE FIFTH
CIRCUIT.

No. 235.   Argued December 13, 14, 1904.—Decided March 13, 1905.

Peonage is a status or condition of compulsory service based upon the indebtedness of the peon to the master. The service is enforced unless the debt be paid, and however created, it is involuntary servitude within the prohibition of the Thirteenth Amendment to the Federal Constitution.

While the ordinary relations of individuals to individuals are subject to the control of the States and not to that of the General Government the Thirteenth Amendment grants to Congress power to enforce the prohibition

against involuntary servitude, including peonage, and to punish persons holding another in peonage; and §§ 1990, 5526, Rev. Stat. are valid legislation under such power and operate directly on every person violating their provisions whether in State or Territory and whether there be or not any municipal ordinance or state law sanctioning such holding.

Conviction cannot be had under an indictment charging defendants with returning certain persons to a condition of peonage unless there is proof that the persons so returned had actually been in such condition prior to the alleged act of returning them thereto.

Where the bill of exceptions, after referring to the empanelling of the jury, contains recitals that the plaintiff produced witnesses, followed in each case by the testimony of the witness at the close of all of which there were farther recitals that the parties rested, these statements are sufficient, even in the absence of a technical affirmative recital to that effect, to show that the bill of exceptions contains all the testimony, and defendant is not to be deprived of a full consideration of the question of his guilt by such omission; and even in the absence of a motion to instruct the jury to find for the defendant this court may examine the question where it is plain that error has been committed.

No matter how severe may be the condemnation due to the conduct of a party charged with crime, it is the duty of the court to see that all the elements of the crime are proved or that testimony is offered which justifies a jury in finding those elements.

SECTIONS 1990 and 5526, Rev. Stat., read:

"SEC. 1990. The holding of any person to service or labor under the system known as peonage is abolished and forever prohibited in the Territory of New Mexico, or in any other Territory or State of the United States; and all acts, laws, resolutions, orders, regulations, or usages of the Territory of New Mexico, or of any other Territory or State, which have heretofore established, maintained, or enforced, or by virtue of which any attempt shall hereafter be made to establish, maintain, or enforce, directly or indirectly, the voluntary or involuntary service or labor of any persons as peons, in liquidation of any debt or obligation, or otherwise, are declared null and void."

"SEC. 5526. Every person who holds, arrests, returns, or causes to be held, arrested, or returned, or in any manner aids in the arrest or return of any person to a condition of peonage, shall be punished by a fine of not less than one thousand nor

more than five thousand dollars, or by imprisonment not less than one year nor more than five years, or by both."

On November 21, 1901, the grand jury returned into the Circuit Court of the United States for the Northern District of Florida an indictment in two counts, the first of which is as follows:

"The grand jurors of the United States of America, empaneled and sworn within and for the district aforesaid, on their oaths present, that one Samuel M. Clyatt, heretofore, to wit: on the eleventh day of February, in the year of our Lord one thousand nine hundred and one, in the county of Levy, State of Florida, within the district aforesaid, and within the jurisdiction of this court, did then and there unlawfully and knowingly return one Will Gordon and one Mose Ridley to a condition of peonage, by forcibly and against the will of them, the said Will Gordon and the said Mose Ridley, returning them the said Will Gordon and Mose Ridley to work to and for Samuel M. Clyatt, D. T. Clyatt, and H. H. Tift, copartners doing business under the firm name and style of Clyatt & Tift, to be held, by them, the said Clyatt & Tift, to work out a debt claimed to be due to them, the said Clyatt & Tift, by the said Will Gordon and Mose Ridley; contrary to the form of the statute in such case made and provided, and against the peace and dignity of the United States."

The second count differs only in charging that defendant caused and aided in returning Gordon and Ridley. A trial resulted in a verdict of guilty, and thereupon the defendant was sentenced to confinement at hard labor for four years. The case was taken on appropriate writ to the Court of Appeals for the Fifth Circuit, which certified to this court three questions. Subsequently the entire record was brought here on a writ of certiorari and the case was heard on its merits.

*Mr. W. G. Brantley* and *Mr. A. O. Bacon*, with whom *Mr. W. M. Hammond* was on the brief, for plaintiff in error:

The anti-peonage laws, Rev. Stat. §§ 1990, 1991, §§ 5522,
VOL. CXCVII—14

5527, 5532, and the act of 1867, 14 Stat. 546, do not define peon and peonage—for definition see Standard, Webster, Worcester, Century, Black's Law, Anderson's Law, Dictionaries; *Jaremillo* v. *Romero*, 1 New Mex. 190; and as given in Congress, Cong. Globe, vol. 38, Pt. 1, pp. 239, 764, 789, Pt. 3, 1571; see also Life and Speeches of Thomas Corwin, 473; 123 Fed. Rep. 673.

Peonage is a legal status and the act of 1867 was directed against the system of peonage as then existing in New Mexico. Individual acts were not legislated against.

The true intent and meaning of the act, so far as the States were concerned, was to prevent them from establishing a "system" of peonage or from enacting, maintaining, or enforcing "laws, resolutions, orders, regulations, or usages" by which peonage could be enforced. So far as the States are concerned, the act is directed specifically against them as States; the only individuals it is directed against are the individuals in the Territories.

The act does not make void any law, regulation, usage, etc., by which there is maintained merely the voluntary or involuntary service or labor of a person in liquidation of a debt or obligation.

"Peonage," it is clear from the act, is something authorized, recognized, or maintained by the State, or Territory. An individual cannot create it.

Nor was Congress endeavoring to legislate the Thirteenth Amendment into effect, because the terms "slavery" and "involuntary servitude" do not appear in the act, but the term "voluntary service," is used and the words "as peons," showing that Congress had in mind something different from the "involuntary servitude" named in the Amendment.

The record discloses no law in Georgia or Florida creating or sanctioning the system of peonage as practiced in New Mexico.

There being no law, resolution, order, or usage of the State by which "peonage" is maintained, established, or enforced, the act of a citizen in depriving another citizen of his liberty,

call the offense "peonage" or any other name, is merely the act of an individual. The wrong is a private wrong and the power to punish for it is vested exclusively in the State. Such punishment comes within the police power of the State, and Congress has no jurisdiction to punish same. Our system of government is a dual one. We have a National Government and a state government. Each has certain powers, duties and jurisdictions, and each is sovereign in its proper sphere. The Government of the United States is one of enumerated powers. As to powers reserved to the States see Ninth and Tenth Amendments; *Moore* v. *Illinois,* 14 How. 13, 17; *United States* v. *DeWitt,* 9 Wall. 41, 45; *Marlin* v. *Hunter,* 1 Wheat. 304, 326; *Slaughter House Cases,* 16 Wall. 36; *United States* v. *Cruikshank,* 92 U. S. 542; *Coffee* v. *Groover,* 123 U. S. 1, 31; *United States* v. *Fox,* 95 U. S. 670; *New York* v. *Miln,* 11 Pet. 103.

If there be but one kind of personal liberty—and we submit there is but one—its protection against the lawless acts of individuals and against lawless violence must be with either the State or the United States. It cannot be with both. There is no such thing as concurrent jurisdiction by the State and the United States over the same criminal offenses. Section 711, Rev. Stat.; *United States* v. *Cruikshank,* 92 U. S. 550; *Gibbons* v. *Ogden,* 9 Wheat. 1; 234; *Fox* v. *United States,* 5 How. 434; *Mangold* v. *United States,* 9 How. 559; *Cross* v. *United States,* 132 U. S. 131.

The State alone has sovereignty and jurisdiction to protect personal liberty against the lawless acts of individuals and against lawless violence. *Logan's case,* 144 U. S. 293, and cases cited; *Kemler's case,* 136 U. S. 448; *The Converse case,* 137 U. S. 632; *United States* v. *Harris,* 106 U. S. 629, 643; *In re Rahrer,* 140 U. S. 545, 554; Cooley's Const. Lim. 706; Pomeroy on Const. Law, 154.

The act of 1867 not being directed against a law or license of a State permitting slavery or involuntary servitude, the same is not "appropriate" legislation under the Thirteenth

Amendment. *Plessy* v. *Ferguson,* 163 U. S. 537, 542; *Civil Rights Cases,* 109 U. S. 3, 20; 25 Am. & Eng. Ency. Law, 1089; *Jones* v. *Van Zandt,* 2 McLean, 596, 601; *Miller* v. *McQuerry,* 5 McLean, 469; cases in 96 Am. Dec. 613; 20 N. Y. 563; *Robertson* v. *Baldwin,* 165 U. S. 275, 292.

The Thirteenth Amendment in its prohibitory feature is aimed solely at the States by its own language. The words "except as a punishment for crime whereof the party shall have been duly convicted" could necessarily apply only to the States, and the full meaning and scope of the Amendment is by this language made plain. *Slaughter House Cases,* 16 Wall. 36, 69; *Le Grand* v. *United States,* 12 Fed. Rep. 577, and note on p. 583; *Re Tiburcher Parrott,* 1 Fed. Rep. 481; *Re Turner,* 1 Abbott's U. S. 84; and see 28 California, 458; 40 California, 198.

The Fourteenth Amendment also is an inhibition against the States but the Fifth Amendment is not—the victim of a murderer is deprived of his life without due process of law but the murderer can be punished only under the state law; the same rule should apply to holding a man in servitude which deprives him of his liberty.

Considering the Fifth, Thirteenth and Fourteenth Amendments together they deal with liberty and the prohibitory feature is against laws, state or National. *United States* v. *Sanges,* 48 Fed. Rep. 78. Undoubtedly one detained in slavery can be set at freedom under the Thirteenth Amendment. *Re Turner,* 1 Abb. U. S. 84; *Re Sah Quah,* 31 Fed. Rep. 327, but that does not mean that the person depriving him of his liberty can be punished by the National Government. The offense is against the State.

The power of Congress over the citizens of the States, or over the police power of the States was not broadened by either the Thirteenth, Fourteenth or Fifteenth Amendments. Cases cited *supra* and *Ex parte Virginia,* 100 U. S. 339; *Powell* v. *Pennsylvania,* 127 U. S. 678; *Leeper* v. *Texas,* 139 U. S. 463; *Claybrook* v. *Owensboro,* 16 Fed. Rep. 297, 301; *James* v. *Bowman,* 190 U. S. 136.

If an act of Congress admits of two interpretations, one within and the other beyond the constitutional power of Congress, the courts must adopt the former construction. *United States* v. *Coombs,* 12 Peters, 72.

The power to enforce the Amendment rests with the States. *Neal* v. *Delaware,* 103 U. S. 370, 389. Georgia promptly recognized the Thirteenth Amendment. Constitution—Code, §§ 5699, 5700, 5701, 5714, 5718, 5763; and see cases reported 72 Georgia, 69; 34 Georgia, 483; 74 Georgia, 247; 95 Georgia, 538; 45 Georgia, 128; Part 3, Georgia Penal Code, §§ 107, 109, 111, 123–134; *Penitentiary Co.* v. *Rountree,* 113 Georgia, 799.

The act of 1867 has no application to Georgia, there being no system of peonage in that State. The indictment is insufficient, not defining the offense, and the proof did not show that any crime had been committed. *United States* v. *Eberhart,* 127 Fed. Rep. 252, 254.

Under a reasonable and proper construction of the act of 1867, in order to authorize the conviction of one for returning another to a condition of peonage, it is necessary to allege in the indictment and to show by proof the existence of some "act, resolution, order, regulation, or usage" of the State where the offense is alleged to have been committed "by virtue of which" said "return to a condition of peonage" was authorized, permitted, or sanctioned.

The language of § 5526, Rev. Stat., is ambiguous. *Neal* v. *Clark,* 95 U. S. 708; *Kohlsaat* v. *Murphy,* 96 U. S. 159; *Market Co.* v. *Hoffman,* 101 U. S. 115.

The evidence does not show any condition of peonage to which any person was returned.

The *Attorney General,* with whom *Mr. Assistant Attorney General Purdy* was on the brief, for the United States:

Congress has plenary power under the Thirteenth Amendment to prohibit the existence of a system of peonage anywhere within the jurisdiction of the United States as a form

of involuntary servitude, and also to make it a criminal offense for any individual to hold, arrest, or return any person to a condition of peonage.

As to term involuntary servitude see Northwest Territory Ordinance of 1787; *Robertson* v. *Baldwin,* 165 U. S. 275, 282; Cooley Const. Law, 237; *Slaughter House Cases,* 16 Wall. 36; *Civil Rights Cases,* 109 U. S. 3, 20; *Plessy* v. *Ferguson,* 163 U. S. 537, 542.

The system of Mexican peonage and the holding of a person to a condition of peonage is involuntary servitude within the meaning of the Constitution. *Jaremillo* v. *Romero,* 1 Gildersleeve (N. M.), 190, and historical citations; 1 Yoakum's Hist. of Texas, 262; 6 Bancroft's Hist. of Mexico, 612; XIII New International Ency. 917; Davis's El Gringo, 231; 2 Fiske's Discovery of America, 427–442; 1 Bancroft's Hist. of Pacific States, 262; Peonage Laws of New Mexico, 1850–1860.

The power of the master to compel the specific performance of an ordinary contract for personal services has never been recognized either by the laws of England or those of the United States. In case the servant abandoned the service of his master before the completion of the contract, the master could always maintain an action to recover damages because of the breach of such contract, but could never compel a specific performance. Charles Manley Smith on Master and Servant, chap. IX, p. 72, and cases cited.

The act of unlawfully and forcibly arresting and returning a person to the custody and control of such person's *creditor,* to be by him held against the will of the *debtor* to labor to pay the debt, is a violation of the laws of the United States within the meaning of section 5526 of the Revised Statutes of the United States. It was the legislative intent of Congress to so enact. Sen. Reports, 2d Sess., 39th Cong. 325.

According to the definitions of lexicographers of that day the word "peon" was not confined to a person compelled by the master to perform involuntary service in liquidation of a debt under a contract for personal service, but included any

service by which one person was bound to serve his creditor until the debt was paid.

The existence or nonexistence of a state statute or usage creating or sanctioning peonage or a system of peonage is wholly immaterial, so far as the operation and effect of § 5526 is concerned, upon the acts of individuals. *Peonage Cases,* 123 Fed. Rep. 671.

MR. JUSTICE BREWER, after making the foregoing statement, delivered the opinion of the court.

The constitutionality and scope of sections 1990 and 5526 present the first questions for our consideration. They prohibit peonage. What is peonage? It may be defined as a status or condition of compulsory service, based upon the indebtedness of the peon to the master. The basal fact is indebtedness. As said by Judge Benedict, delivering the opinion in *Jaremillo* v. *Romero,* 1 N. Mex. 190, 194: "One fact existed universally; all were indebted to their masters. This was the cord by which they seemed bound to their masters' service." Upon this is based a condition of compulsory service. Peonage is sometimes classified as voluntary or involuntary, but this implies simply a difference in the mode of origin, but none in the character of the servitude. The one exists where the debtor voluntarily contracts to enter the service of his creditor. The other is forced upon the debtor by some provision of law. But peonage, however created, is compulsory service, involuntary servitude. The peon can release himself therefrom, it is true, by the payment of the debt, but otherwise the service is enforced. A clear distinction exists between peonage and the voluntary performance of labor or rendering of services in payment of a debt. In the latter case the debtor, though contracting to pay his indebtedness by labor or service, and subject like any other contractor to an action for damages for breach of that contract, can elect at any time to break it, and no law or force compels

performance or a continuance of the service. We need not stop to consider any possible limits or exceptional cases, such as the service of a sailor, *Robertson* v. *Baldwin,* 165 U. S. 275, or the obligations of a child to its parents, or of an apprentice to his master, or the power of the legislature to make unlawful and punish criminally an abandonment by an employé of his post of labor in any extreme cases. That which is contemplated by the statute is compulsory service to secure the payment of a debt. Is this legislation within the power of Congress? It may be conceded as a general proposition that the ordinary relations of individual to individual are subject to the control of the States and are not entrusted to the General Government, but the Thirteenth Amendment, adopted as an outcome of the civil war, reads:

"Sec. 1. Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

"Sec. 2. Congress shall have power to enforce this article by appropriate legislation."

This amendment denounces a status or condition, irrespective of the manner or authority by which it is created. The prohibitions of the Fourteenth and Fifteenth Amendments are largely upon the acts of the States, but the Thirteenth Amendment names no party or authority, but simply forbids slavery and involuntary servitude, grants to Congress power to enforce this prohibition by appropriate legislation. The differences between the Thirteenth and subsequent Amendments have been so fully considered by this court that it is enough to refer to the decisions. In the *Civil Rights Cases,* 109 U. S. 3, 20, 23, Mr. Justice Bradley, delivering the opinion of the court, uses this language:

"This Amendment, as well as the Fourteenth, is undoubtedly self-executing without any ancillary legislation, so far as its terms are applicable to any existing state of circumstances. By its own unaided force and effect it abolished slavery, and

established universal freedom. Still, legislation may be necessary and proper to meet all the various cases and circumstances to be affected by it, and to prescribe proper modes of redress for its violation in letter or spirit. And such legislation may be primary and direct in its character; for the amendment is not a mere prohibition of state laws establishing or upholding slavery, but an absolute declaration that slavery or involuntary servitude shall not exist in any part of the United States.

\* \* \* \* \* \* \* \*

"We must not forget that the province and scope of the Thirteenth and Fourteenth Amendments are different; the former simply abolished slavery: the latter prohibited the States from abridging the privileges or immunities of citizens of the United States; from depriving them of life, liberty or property without due process of law, and from denying to any the equal protection of the laws. The amendments are different, and the powers of Congress under them are different. What Congress has power to do under one, it may not have power to do under the other. Under the Thirteenth Amendment, it has only to do with slavery and its incidents. Under the Fourteenth Amendment, it has power to counteract and render nugatory all state laws and proceedings which have the effect to abridge any of the privileges or immunities of citizens of the United States, or to deprive them of life, liberty or property without due process of law, or to deny to any of them the equal protection of the laws. Under the Thirteenth Amendment, the legislation, so far as necessary or proper to eradicate all forms and incidents of slavery and involuntary servitude, may be direct and primary, operating upon the acts of individuals, whether sanctioned by state legislation or not; under the Fourteenth, as we have already shown, it must necessarily be, and can only be, corrective in its character, addressed to counteract and afford relief against state regulations or proceedings."

In *Plessy* v. *Ferguson*, 163 U. S. 537, 542, Mr. Justice Brown, delivering the opinion of the court, said:

"That it does not conflict with the Thirteenth Amendment, which abolished slavery and involuntary servitude, except as a punishment for crime, is too clear for argument. Slavery implies involuntary servitude—a state of bondage; the ownership of mankind as a chattel, or at least the control of the labor and services of one man for the benefit of another, and the absence of a legal right to the disposal of his own person, property and services. This amendment was said in the *Slaughter House Cases*, 16 Wall. 36, to have been intended primarily to abolish slavery, as it had been previously known in this country, and that it equally forbade Mexican peonage or the Chinese coolie trade, when they amounted to slavery or involuntary servitude, and that the use of the word 'servitude' was intended to prohibit the use of all forms of involuntary slavery, of whatever class or name."

Other authorities to the same effect might be cited. It is not open to doubt that Congress may enforce the Thirteenth Amendment by direct legislation, punishing the holding of a person in slavery or in involuntary servitude except as a punishment for crime. In the exercise of that power Congress has enacted these sections denouncing peonage, and punishing one who holds another in that condition of involuntary servitude. This legislation is not limited to the Territories or other parts of the strictly National domain, but is operative in the States and wherever the sovereignty of the United States extends. We entertain no doubt of the validity of this legislation, or of its applicability to the case of any person holding another in a state of peonage, and this whether there be municipal ordinance or state law sanctioning such holding. It operates directly on every citizen of the Republic, wherever his residence may be.

Section 5526 punishes "every person who holds, arrests, returns, or causes to be held, arrested, or returned." Three distinct acts are here mentioned—holding, arresting, returning.

The disjunctive "or" indicates the separation between them, and shows that either one may be the subject of indictment and punishment. A party may hold another in a state of peonage without ever having arrested him for that purpose. He may come by inheritance into the possession of an estate in which the peon is held, and he simply continues the condition which was existing before he came into possession. He may also arrest an individual for the purpose of placing him in a condition of peonage, and this whether he be the one to whom the involuntary service is to be rendered or simply employed for the purpose of making the arrest. Or he may, after one has fled from a state of peonage, return him to it, and this whether he himself claims the service or is acting simply as an agent of another to enforce the return.

The indictment charges that the defendant did "unlawfully and knowingly return one Will Gordon and one Mose Ridley to a condition of peonage, by forcibly and against the will of them, the said Will Gordon and the said Mose Ridley, returning them, the said Will Gordon and the said Mose Ridley, to work to and for Samuel M. Clyatt."

Now a "return" implies the prior existence of some state or condition. Webster defines it "to turn back; to go or come again to the same place or condition." In the Standard Dictionary it is defined "to cause to take again a former position; put, carry, or send back, as to a former place or holder." A technical meaning in the law is thus given in Black's Law Dictionary: "The act of a sheriff, constable, or other ministerial officer, in delivering back to the court a writ, notice, or other paper."

It was essential, therefore, under the charge in this case to show that Gordon and Ridley had been in a condition of peonage, to which, by the act of the defendant, they were returned. We are not at liberty to transform this indictment into one charging that the defendant held them in a condition or state of peonage, or that he arrested them with a view of placing them in such condition or state. The pleader has seen

fit to charge a return to a condition of peonage. The defendant had a right to rely upon that as the charge, and to either offer testimony to show that Gordon and Ridley had never been in a condition of peonage or to rest upon the Government's omission of proof of that fact.

We must, therefore, examine the testimony, and the first question that arises is, whether the record sufficiently shows that it contains all the testimony. The bill of exceptions, after reciting the empanelling of the jury, proceeds in these words:

"And thereupon the plaintiff, to maintain the issues upon its part, produced and offered as a witness James R. Dean, who, being first duly sworn, did testify as follows:"

That recital is followed by what purports to be the testimony of the witness. Then follows in succession the testimony of several witnesses, each being preceded by a statement in form similar to this: "The plaintiff then introduced and offered as a witness, H. S. Sutton, who, being first duly sworn, did testify as follows." At the close of the testimony of the last witness named is this statement:

"Whereupon the plaintiff rests its case.

"Defendant rests—introduces no testimony.

"And the said judge, after charging the jury on the law in the case, submitted the said issues and the evidence so given on the trial, to the jury, and the jury aforesaid then and there gave their verdict for the plaintiff."

It is true there is no affirmative statement in the bill of exceptions that it contains all the testimony, but such omission is not fatal. This question was presented in *Gunnison County Commissioners* v. *Rollins*, 173 U. S. 255, a civil case, brought to this court on certiorari to the Circuit Court of Appeals, which court had held that the bill of exceptions did not purport to contain all the evidence adduced at the trial, and for that reason did not consider the question whether error was committed in instructing the jury to find for the defendant. Mr. Justice Harlan, delivering the unanimous opinion

of the court, disposed of that question in these words (p. 261):

"We are of opinion that the bill of exceptions should be taken as containing all the evidence. It appears that as soon as the jury was sworn to try the issues in the cause 'the complainants, to sustain the issues on their part, offered the following oral and documentary evidence.' Then follow many pages of testimony on the part of the plaintiffs, when this entry appears: 'Whereupon complainants rested.' Immediately after comes this entry: 'Thereupon the defendants, to sustain the issues herein joined on their part, produced the following evidence.' Then follow many pages of evidence given on behalf of the defendant, and the evidence of a witness recalled by the defendant, concluding with this entry: 'Whereupon the further proceedings herein were continued until the 20th day of May, 1896, at 10 o'clock A. M.' Immediately following is this entry: 'Wednesday, May 20th, at 10 o'clock, the further trial of this cause was continued as follows.' The transcript next shows some discussion by counsel as to the exclusion of particular evidence, after which is this entry: 'Thereupon counsel for defendant made a formal motion under the evidence on both sides that the court instruct the jury to return a verdict for the defendant.' Although the bill of exceptions does not state, in words, that it contains all the evidence, the above entries sufficiently show that it does contain all the evidence."

The present case is completely covered by that decision. If in a civil case such recitals in the bill of exceptions are sufficient to show that it contains all the testimony *a fortiori* should this be the rule in a criminal case, and the defendant therein should not be deprived of a full consideration of the question of his guilt by an omission from the bill of the technical recital that it contains all the evidence.

While no motion or request was made that the jury be instructed to find for defendant, and although such a motion is the proper method of presenting the question whether there is evidence to sustain the verdict, yet *Wiborg* v. *United States,*

163 U. S. 632, 658, justifies us in examining the question in case a plain error has been committed in a matter so vital to the defendant.

The testimony discloses that the defendant with another party went to Florida and caused the arrest of Gordon and Ridley on warrants issued by a magistrate in Georgia for larceny, but there can be little doubt that these criminal proceedings were only an excuse for securing the custody of Gordon and Ridley and taking them back to Georgia to work out a debt. At any rate, there was abundant testimony from which the jury could find that to have been the fact. While this is true, there is not a scintilla of testimony to show that Gordon and Ridley were ever theretofore in a condition of peonage. That they were in debt and that they had left Georgia and gone to Florida without paying that debt, does not show that they had been held in a condition of peonage, or were ever at work willingly or unwillingly for their creditor. We have examined the testimony with great care to see if there was anything which would justify a finding of the fact, and can find nothing. No matter how severe may be the condemnation which is due to the conduct of a party charged with a criminal offense, it is the imperative duty of a court to see that all the elements of his crime are proved, or at least that testimony is offered which justifies a jury in finding those elements. Only in the exact administration of the law will justice in the long run be done, and the confidence of the public in such administration be maintained.

We are constrained, therefore, to order a reversal of the judgment, and remand the case for a new trial.

MR. JUSTICE McKENNA concurs in the judgment.

MR. JUSTICE HARLAN: I concur with my brethren in holding that the statutes in question relating to peonage are valid under the Constitution of the United States. I agree also that the record sufficiently shows that it contains all the evidence introduced at the trial.

But I cannot agree in holding that the trial court erred in not taking the case from the jury. Without going into the details of the evidence, I care only to say that, in my opinion, there was evidence tending to make a case within the statute. The opinion of the court concedes that there was abundant testimony to show that the accused with another went from Georgia to Florida to arrest the two negroes, Gordon and Ridley, and take them against their will back to Georgia to work out a debt. And they were taken to Georgia by force. It is conceded that peonage is based upon the indebtedness of the peon to the master. The accused admitted to one of the witnesses that the negroes owed him. In any view, there was no motion or request to direct a verdict for the defendant. The accused made no objection to the submission of the case to the jury, and it is going very far to hold in a case like this, disclosing barbarities of the worst kind against these negroes, that the trial court erred in sending the case to the jury.