### BERNAL v. UNITED STATES.

(Circuit Court of Appeals, Fifth Circuit. April 6, 1917.)

No. 2970.

1. SLAVES ⊂⇒24—PEONAGE—INDICTMENT—SUFFICIENCY.
   An indictment charging that defendant willfully and knowingly held three persons to a condition of peonage, that is to say, defendant kept and held them, by threats and putting them in fear, against their wills, to perform labor to work out debts claimed to be due defendant, is in due form and sufficient in law.
   [Ed. Note.—For other cases, see Slaves, Cent. Dig. §§ 54, 55.]

2. CRIMINAL LAW ⊂⇒911, 1156(1)—APPEAL—REVIEW—DISCRETION—REFUSING NEW TRIAL.
   The granting of a new trial in a criminal prosecution is within the sound discretion of the trial court, and error cannot be predicated upon a refusal.
   [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2134, 3067.]

3. SLAVES ⊂⇒24—PEONAGE—EVIDENCE—SUFFICIENCY.
   In a prosecution for peonage, evidence of the prosecuting witness, if believed by the jury, held sufficient to show that defendant had forced her to work out a debt by threats and fear.
   [Ed. Note.—For other cases, see Slaves, Cent. Dig. §§ 54, 55.]

---

⊂⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes.

4. CRIMINAL LAW ⬅865(1)—TRIAL—SUPPLEMENTAL CHARGE—DUTY TO REACH AGREEMENT.

A supplemental charge, given by the court after the jury had been out for some time and had reported that they stood eight to four, without indicating what verdict the majority favored, as to their duty to reach an agreement and terminate the case, but which did not indicate the opinion of the court as to the guilt or innocence of accused, or comment on the facts, was not error.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 2069.]

5. SLAVES ⬅24—"PEONAGE"—ELEMENTS OF OFFENSE.

It is sufficient to constitute "peonage" that a person is held against his will and made to work to pay a debt; the amount of the debt and the means of coercion being immaterial.

[Ed. Note.—For other cases, see Slaves, Cent. Dig. §§ 54, 55.

For other definitions, see Words and Phrases, First and Second Series, Peonage.]

6. CRIMINAL LAW ⬅865(2)—TRIAL—COERCION OF JURY.

The length of time a jury will be held for deliberation rests within the sound discretion of the court, and no abuse of discretion is shown by holding them from Saturday afternoon till Monday.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 2069.]

Pardee, Circuit Judge, dissenting.

In Error to the District Court of the United States for the San Antonio Division of the Western District of Texas; Gordon Russell, Judge.

Aurelia P. Bernal was convicted of peonage, and she brings error. Affirmed.

Carlos Bee, of San Antonio, Tex., for plaintiff in error.

J. L. Camp, U. S. Atty., of San Antonio, Tex.

Before PARDEE and WALKER, Circuit Judges, and FOSTER, District Judge.

FOSTER, District Judge. Plaintiff in error, hereafter referred to as defendant, was indicted for peonage. The material part of the indictment reads as follows:

"That heretofore, to wit, on or about the 24th day of February, A. D. 1916, at the city of San Antonio, Western district of Texas, and the San Antonio division thereof, Aurelia P. Bernal did unlawfully, willfully, and knowingly hold one Sofia Vivar, one Rosenda Nava, and Angelina Flores to a condition of peonage; that is to say, she, the said Aurelia P. Bernal, did then and there keep and hold, by threats and by putting them in fear, the said Sofia Vivar, the said Rosenda Nava, and the said Angelina Flores, and each of them, against their wills, to perform labor to work out debts claimed to be due her, the said Aurelia P. Bernal, by them, the said Sofia Vivar, the said Rosenda Nava, and the said Angelina Flores."

A motion to quash the indictment was overruled; the case went to trial and resulted in a verdict of guilty. A motion for a new trial was overruled, and a sentence of 2½ years imposed.

[1] There are 11 assignments of error. The first 5 run to the overruling of the motion to quash and are clearly not well taken, as the indictment is in due form and sufficient in law. The sixth and seventh

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

assignments of error are based on objections to the admissibility of certain testimony. In view of the character of the case and the other evidence admitted without objection, the testimony admitted was relevant; but, even if not, it was certainly not prejudicial.

[2] The eighth, ninth, tenth, and eleventh assignments of error are based upon the refusal of the court to grant a new trial. It is elemental that the granting of a new trial is within the sound discretion of the court, and error cannot be predicated upon a refusal.

[3] This brings us to a consideration of whether or not there is error apparent upon the record which the court may notice without assignment under the provision of rule 11 (150 Fed. xxvii, 79 C. C. A. xxvii). There was no motion to direct a verdict in favor of the defendant, but the entire evidence has been brought up in the transcript, together with the charge of the court, and we have carefully examined same. The testimony is conflicting, but the witness Rosenda Nava, a Mexican alien, one of the persons named in the indictment as having been held in peonage, testified in substance that she was working as a domestic servant in Laredo, Tex., earning $4 per week; that the defendant talked to her, told her she was the proprietor of a small hotel in San Antonio, and engaged her to work as chambermaid at $6 per week, and told her that, if she found the work not agreeable and wanted to leave, she would give her a ticket back to Laredo. She was then taken by the defendant to San Antonio, with the two other girls named in the indictment, to a house of prostitution operated by the defendant. She refused to practice prostitution, and was told by defendant that she could not leave the house until she had paid back the fare from Laredo to San Antonio. She was sent out on errands in the neighborhood, but during these times defendant watched her from an upper window. The defendant told her that, if she tried to leave, she would telegraph to the immigration officers and they would put her in jail for five years. When the defendant told her this, she was very much afraid of her. She had no money, did not know her way about town, and remained in fear of the defendant. She succeeded on one of her errands in sending a note to a cousin who resided in San Antonio. In response to the note, a friend of the cousin came and brought a policeman with him. She was unknown to him personally, and, when he inquired for her, he was told by defendant that there was no such person in the house. She succeeded in making her identity known, and was taken from the house by the policeman, and eventually restored to her family. While in the house of the defendant, she and another girl named Sofia did all of the domestic work, but received no pay and very little to eat. She did not at any time engage in prostitution. There was evidence tending to corroborate her in part, and also evidence tending to rebut some of her testimony.

Both of the other girls named in the indictment testified they became dissatisfied and wanted to leave the house, but were told by the defendant they could not go, as they owed her money. The indictment is hardly supported as to them, as they seem to have entered, with more or less willingness, upon a life of prostitution, and were not placed under the same restraint as the other girl; but their testimony is

strongly corroborative of the witness Rosenda Nava. She is further corroborated by the defendant, who testified she did not take Rosenda Nava to San Antonio to become a prostitute, that she did part of the menial work of the house, that she did not engage in prostitution, and that she had no money. The defendant denied any threats or coercion as to any of the girls named in the indictment.

[4] No exception was taken to the charge of the court as originally given, and no special charges were requested. The case went to the jury at 2:30 p. m. Saturday, June 10, 1916. After the jury had deliberated for several hours, they advised the court they could not agree, but the court declined to release them. They remained sequestered until Monday, June 12, 1916, at 10 o'clock a. m. They then reported to the court that they were unable to agree, and that they stood eight to four; but no indication was given as to what verdict the majority favored. The court then charged the jury on their duty to reach an agreement and terminate the case. No indication was given the jury as to the opinion of the court regarding the guilt or innocence of the accused, and no comment was made on the facts of the case.

[5] The law takes no account of the amount of the debt or the means of coercion. It is sufficient to constitute the crime that a person is held against his will and made to work to pay a debt. Clyatt v. United States, 197 U. S. 207, 25 Sup. Ct. 429, 49 L. Ed. 726. The court charged the jury clearly and explicitly on the law. The credibility of the witnesses, the weight and sufficiency of the evidence, and the resolving of the conflicts in the testimony were matters for the jury. If they believed the witness Rosenda Nava, her testimony was sufficient to support the indictment.

[6] The defendant complains most loudly, however, because the jury was held from Saturday until Monday, and of the supplemental charge of the court. It is not unusual for juries to be held over Sunday in criminal cases; but, in any event, this was a matter resting in the sound discretion of the court, and no abuse of discretion is shown. Neither was there error committed in giving the supplemental charge.

On the whole case, as none of the assignments is well taken, and there is no plain error which the court may notice of its own motion, it follows that the judgment must be affirmed.

PARDEE, Circuit Judge. I dissent in this case, because the evidence is not sufficient to prove the guilt of the appellant, and also because I find the eleventh assignment of error well taken, to wit:

"The court erred in overruling defendant's motion for a new trial because, after the jury had retired for consideration of their verdict on June 10, 1916, at 2:20 p. m., they conveyed to the court on the same afternoon the information that they were not able to agree and asked to be discharged, and were sent to the jury room for further consideration, and on June 12, 1912, at the hour of 10 o'clock a. m., the jury again advised the court that they were unable to agree and asked to be discharged, and the court thereupon advised the jury in substance, as follows:

" 'The Court: How are you divided as to numbers?

" 'A' Juror: Eight to four.

" 'The Court: Gentlemen, I sent for you for the purpose of seeing whether you had reached an agreement, and inquire whether you needed any

additional instructions as to the law in order to clear up any differences between the jurors. Have you any trouble about understanding the charge of the court given you?

" 'A Juror: I have not heard of any.

" 'The Court: Do the balance of the jurors concur in that statement? You are agreed with reference to the instructions of the court? (No answer.)

" 'The Court: Gentlemen, I wish to say this to you: That it would be a very peculiar judge who would want to keep a jury out with any desire on his part to punish or coerce you in any way. I certainly would not, if I could, coerce any jury into a verdict, because, when I finish telling you the law in the case and commit it to you, I commit it then to 12 men whose functions are just as important as mine, and who are charged with the province or a duty that is superlatively grave; and I commit it to 12 men, and I feel sure the officers have selected you because of your fitness and competency to discharge in a proper way that grave duty; but it might not be out of place for me to say this to you: That if every case of this district met with the same fate that up to this time this case has met with, it would amount practically to a denial of justice in the courts. Suppose every jury did just what you have done, then men who had cases in this court involving either rights of property or liberty would never move one peg year by year, and docket after docket. I want to say to you that courthouse trials are designed primarily to try, as far as is possible, to do abstract justice. That is primarily the object of courthouse trials; but you know as sensible men, and I know as a sensible man, that absolutely abstract justice does not obtain outside the courts of heaven, because, as long as men are imperfect, imperfection necessarily will creep into trials in the court room. That is why we have appellate courts, to correct errors in the trial court. But for that it would be an inexcusable waste of public money to have higher courts sitting in judgment on the courts below. So that one of the great objects of having courthouse trials is to end controversies. End them justly, if you can, of course; but end the controversies. In savage countries, where there are no courts, men go out and vindicate their view of the law by their own strong arms; but among civilized people we have got beyond that; and we select certain tribunals to which we submit cases for them to decide, and one of the greatest objects in view is to end controversies, and it ought to be done. Why, if all of these litigants in this court had to come back court after court, time after time, it would be an endless proposition. There is going to be some jury somewhere that is going to decide the case and get over with it. You gentlemen may not do it; but, if you fail to do it, there will come another jury that will, and the people will not be put to the expense of bringing witnesses here and summoning jurors from the various walks of life to try the case. Now, you gentlemen are divided as to what your verdict will be. I believe I can say, from looking on your faces, and I have had a very fair chance in judging men, and there is no man on the jury that would suffer his pride of opinion—because he had said a thing—to stand in his way, and because he said a thing not to yield to reason. Re-examine the ground, and see if you cannot agree. You know there is all the difference in the world between firmness and stubbornness. Now, the most stubborn thing on the face of this earth is a jackass. Now, a man can be firm, and a man may be stubborn. I have respect for a man that is firm in his belief, but not that much (snaps fingers) for a stubborn man. He has said the horse is 17 feet high, and he is going to stick to it. Now, I can look at you gentlemen and feel that you are not that way. I never try a case in court that I do not frequently change opinion, and I would have a contempt for myself if some brother of the bar should convince me I was in error and I would not instantly correct it. One of the highest forms of integrity is intellectual integrity, and we all admire the man who will throw aside pride of opinion and do what he thinks right, no matter what the result will be. If I was in the minority, I would carefully go over the ground again, and see if by chance I have not happened to be mistaken and if the real wisdom of the situation wasn't perhaps with the majority of the jury. Now, gentlemen, I have made these remarks to you because I feel an interest in every controversy in

every court over which I preside. Of course, I wish you to understand that, if you have taken a position you cannot abandon without a violation of your oath and conscience, I do not expect you to abandon it, and I say that to you with all emphasis. But I don't want you to forget that a courthouse trial is not only to do justice, if you can, but to settle controversies. Why the United States might as well by special statute abolish the court of the Western district of Texas if juries are never to agree. Gentlemen, I don't want to punish you, but I want you to go over the ground again, as men who are willing to do what is right, whether you have announced yourself on one position or not. The game fellow doesn't hesitate to say, "I am wrong" when he is wrong. Now, gentlemen, I am about through with this court here, and after I am I have to keep on working, and I am sure you are as willing to work as I am, and I hope you will reach a verdict one way or the other. Come this way, gentlemen.'

"To which action of the court the defendant duly excepted, and still excepts, because the effect of said charge operated as a moral coercion, and the verdict of the jury brought in thereafter, finding the defendant guilty, was not their verdict, but the verdict of the court; the jury having under said statement theretofore set out substituted the will and judgment of the court for their own will and judgment."