## PIERCE v. UNITED STATES.

### No. 10920.

Circuit Court of Appeals, Fifth Circuit.

Dec. 4, 1944.

Albert L. Cobb and Shelby Myrick, both of Savannah, Ga., for appellant.

J. Saxton Daniel, U. S. Atty., and Green B. Everitt, Asst. U. S. Atty., both of Savannah, Ga., for appellee.

Before SIBLEY, HUTCHESON, and McCORD, Circuit Judges.

McCORD, Circuit Judge.

An indictment in eleven counts was returned charging Joel Thomas Pierce with peonage. The jury returned a verdict of guilty on counts 1, 2, 5, 6, 7, 8, and 9, and not guilty on counts 3, 4, 10 and 11. Pierce was sentenced to pay a fine of $500 and to serve a term of eighteen months imprisonment on each count, the prison sentences to run consecutively.

The evidence shows that Pierce operated the Lone Star Club, a road house located approximately 20 miles from Savannah in Bryan County, Georgia. The club building was a two-story structure, with bed rooms upstairs, and dance hall, bar and whiskey package shop downstairs. Individual cabins, which might be used for sleeping quarters, were located in the rear of the building. Meals, sandwiches, and drinks were served at the club, and whiskey was sold from the package shop. A number of girls and young women were employed by Pierce to attend the bar, act as waitresses and hostesses, and dance with the customers.

In each count a different girl is alleged to have been held in peonage by the defendant, and each one so named and designated testified as a witness on the trial. The evidence shows that the girls and young women employed by Pierce were required against their wills to engage in acts of immorality and to practice prostitution at this road house. On many occasions the defendant commanded the girls to fill dates with men, he having already made arrangements and collected the money therefor. At times these acts took place in the cabins and on other occasions in the bed rooms upstairs over the club.

The defendant secured two girls from the Georgia State Prison at Reidsville, Georgia, obtaining their release upon payment of their fines. He bargained with these women to repay him by working at his road house. They were then taken by Pierce to the club for the purpose of working as waitresses and hostesses, but were required to commit immoral acts while there. After remaining at the road house a few days they finally had the opportunity to complain to a deputy sheriff of Bryan County, and informed him that they were being held against their will by Pierce, whereupon warrants were issued in Bryan County in the state court to be used by the deputy sheriff in effecting the re-

lease of the girls from the road house. Complaint was also made by one of the girls to the Federal Bureau of Investigation.

The evidence further shows that when girls were employed by the defendant, it was his practice to immediately purchase dresses and other wearing apparel for them, and that when they would request permission to leave the place he would refuse to let them go, telling them they were indebted to him for clothing which he had purchased. Some of the girls were subjected to physical violence and for this reason they were afraid of Pierce; afraid to undertake to leave his place, being apprehensive for their own safety.

In counts 2, 5, 6, 7, 8 and 9, each of the named girls testified that she was held by the defendant for debt, and that he refused upon request to permit her to leave his employ at the road house.

In Count 2, the girl named as being held in peonage testified that she was there with her sister for two months, and Pierce told her that she could not leave but had to stay there; that he had bought clothes for her and said that she owed him for the clothes; that she had to work for him; that she filled dates with men; that money was passed for these transactions, that Pierce took the money. "I know he got it because I gave it to him $10 at a time. I asked him to let me go several times and he told me I couldn't leave and that I would have to stay there and work for the clothes he had got me. * * *"

The girl named in Count 5 testified: "I worked for him, (Pierce) in March of this year. I remained there about two and a half or three months; I was not satisfied to stay there, but I was afraid to leave, he held out so many threats, that he would beat us; I asked him to let me leave and he said he wouldn't, that we were in debt to him. * * *."

The girl named in Count 6 testified: "I asked him several times to let me go home but he wouldn't do it, said I owed him money, had to stay there and pay it; I don't think I owed him anything; I think he was to pay me $8.00 a week and a percentage on the victrola, but he didn't pay me any of it. How I got away, he went to Swainsboro to get more girls to work for him and I made like I had to go to get some mayonaise and got the money to get it and came on to Savannah, * * *."

The girl named in Count 7 testified: "I was against filling dates with men and he beat me upstairs in my room; he come in there; he didn't beat me very bad but it didn't feel so good for some man to be beating on you with a boot; after that happened I asked him if I could leave and he cursed me and wouldn't let me go and wouldn't let me write my mother; * * * Mr. Pierce bought me an Easter suit when I went out there; I was supposed to work and pay him back, and I put enough in that pianola to pay him for two or three suits. When I wanted to get away he said I owed him money and tell the rest of the girls I owed him. I was just afraid to leave; he was gone lots of times while I was there, but I was afraid to leave. * * *."

The girl named in Count 8 testified that she and her sister were in prison at Reidsville, Georgia; that Pierce came out there on Sunday and talked to them. "He said then he would get us out and we could work it out with him; he said he wanted us as waitresses, said he had a restaurant; he paid us out, $25 for each of us, and he said it cost $100 to spring it besides the $25 apiece; and he paid us out and carried us to his place, the Lone Star Club; I worked behind the bar some, selling drinks, and my sister entertained men, we both did; he told us to fill dates with men; we did that because we had to; it was not voluntary on my part, it was against my wishes; I did not see any money pass on my part, but I saw three men give Pierce $30.00 for three girls to go off with them. * * * My sister finally took out a warrant for me, and a deputy sheriff came and got me and also got (two other girls) and took us to the court house and we were questioned. I did not give bond, I did not try to, I did not want to; some of them said Mr. Pierce said he would go on our bond if we wanted him to but (one of the girls) and I stayed in jail; I did it because I didn't want to go back down there; I was leaving there for good; I was not turned out of jail, they brought me up here to the hearing in this charge against Mr. Pierce and I testified in that preliminary hearing. Yes, sir; Mr. Pierce had a pistol, I saw it; * * * I was scared of him. * * *."

The girl named in Count 9 testified that she was in prison at Reidsville, Georgia, and that her sister was in there with her, each was serving a sentence for vagrancy;

that they agreed to go and work for him, and he "told us the place was a nice place and all like that; that he had a bunch of nice girls who had been working there for him for years; on the papers it cost $25 apiece to get us out but Mr. Pierce told me he paid an extra $100 to spring it, that would be a total of $150 he paid; he carried us out there in his car to his place. * * * The reason I left was he wanted all of us to fill dates with men; I mean by that one night a man came there and Mr. Pierce told me to go out to a room with him and I asked him what for and he said 'You go into the room, I already have the man's money;' he did not tell me how much money he had and I then told him I didn't fill dates to keep myself up and I didn't intend to fill dates to keep men up, and he said if I didn't he would beat me up, and so I went on in the room then and filled the date; I went in the room because I was afraid he would beat me up, and that was because I had seen him beat up other girls. * * *."

No good purpose could be served by following the evidence further, since it winds its way through the record making a sordid narrative of degradation and shame.

 Peonage is a status or condition of compulsory service or involuntary servitude based upon a real or alleged indebtedness. Bailey v. Alabama, 219 U.S. 219, 31 S.Ct. 145, 55 L.Ed. 191; Clyatt v. United States, 197 U.S. 207, 25 S.Ct. 429, 49 L.Ed. 726; United States v. Clement, D.C., 171 F. 974. In a prosecution for peonage, the law takes no account of the amount of the debt, or the means and method of coercion. It is sufficient to allege and prove that a person is held against his will and made to work to pay a debt. Bernal v. United States, 5 Cir., 241 F. 339; Taylor v. Georgia, 315 U.S. 25, 62 S.Ct. 415, 86 L.Ed. 615; United States v. Gaskin, 320 U.S. 527, 64 S.Ct. 318.

 In a prosecution for peonage, as is generally true in criminal cases, evidence of the prosecuting witness, if believed by the jury, may be abundantly sufficient to support a conviction. Bernal v. United States, 5 Cir., 241 F. 339. Here, in Counts 2, 5, 6, 7, 8 and 9, the evidence of prosecuting witnesses was sufficient to show that Pierce had forced these girls to work against their wills, claiming the work was for debts which they owed to him.

We are of opinion and so hold that the evidence is not sufficient to support the judgment as to Count 1 of the indictment, and it is, therefore, reversed.

The judgments on Counts 2, 5, 6, 7, 8 and 9 being supported by the evidence, and in accordance with the applicable law, are in all respects affirmed.

HUTCHESON, Circuit Judge (concurring in part, dissenting in part).

As to Counts 8 and 9, charging peonage as to Rose Fisher and her sister, Pollie Melton, the evidence sufficiently establishes a condition of peonage, that is a contract between the defendant and the two girls there concerned, inmates of the Reidsville Prison, to work out the fine the defendant had paid for them. I, therefore, concur in the affirmance of the judgment as to these counts.

As to the other counts, there is neither claim nor proof that the *women named in it had entered into a contract with Pierce obligating them to work for him until they worked out the claimed debt.* Absent such an agreement, *there was no condition of peonage,* and I dissent from the affirmance as to those counts.

The 13th Amendment provides broadly:

Sec. 1. "Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist in the United States, or any place subject to their jurisdiction."

Sec. 2. "Congress shall have power to enforce this article by appropriate legislation."

Pursuant to the authority thus conferred, Congress passed the Act of March 2, 1867, the provisions of which now appear as Sec. 56, 8 U.S.C.A.[1] and Section 444, 18

---

1 "The holding of any person to service or labor under the system known as peonage is abolished and forever prohibited in any Territory or State of the United States; and all acts, laws, resolutions, orders, regulations, or usages of any Territory or State, which have heretofore established, maintained, or enforced, or by virtue of which any attempt shall hereafter be made to establish, maintain, or enforce, directly or indirectly, the voluntary or involuntary service or labor of any persons as peons, in liquidation of any debt or obligation, or otherwise, are declared null and void." Sec. 56, 8 U.S.C.A.

U.S.C.A.[2] It will be noted that though the amendment broadly prohibits involuntary servitude without limitation, the statutes are aimed at and *confined to peonage.* Section 56 abolishes the holding of any person to service or labor under the system known as peonage, and *all acts, laws, resolutions, orders, regulations or usages which have established and maintained or may in future establish and maintain "the voluntary or involuntary service or labor of any persons as peons."* Sec. 444 makes penal and provides punishment for not any and all kinds of involuntary servitude, but only that kind which is "a condition of peonage." To that end it provides a fine and imprisonment for "whoever holds * * * or causes to be held * * * any person to a condition of peonage." These plain provisions make it quite clear that in order to convict, the indictment must charge, and the proof must show, facts which *amount to a holding or causing to be held in a condition of peonage.* The statutes have been on the books since 1867 and many cases have been tried under them. No case until this one has ever held that, absent a contract, law or usage requiring service in payment of a debt, a condition of peonage is made out. Brief references will show this to be so. In Peonage Cases, D.C., 123 F. 671, 673, in a learned discussion of peonage, the court said:

"The peon was not a slave. He was a freeman, with political as well as civil rights. He entered into the relation from choice, for a definite period, as result of mutual contract. * * * The peon, male or female, agreed with the master upon the nature of the service, the length of its duration, and compensation. The peon then became bound to the master 'for an indebtedness founded upon an advancement in consideration of service'."

Again citing the Act of 1867:

"The meaning of the terms in this statute must be sought in the light of this history of the institution in New Mexico, and the design of Congress, interpreted in the light of the evil 'condition' that system developed, which the statute declared should not thereafter exist in any state or territory."

Holding that it was not necessary that the peonage be brought about by the precise system developed in New Mexico, the court held that the condition was prohibited no matter how brought about. *Discussing holding or returning to a condition of peonage,* the court said, "What is meant by a 'condition of peonage,' or holding or return thereto, is easily gathered from the words of the statute, and the working of the system in New Mexico when upheld there as a legal institution. Under the abolished system, as we have seen, *the citizen could sell his own services, and could contract with another for the exercise of dominion thereafter over his person and liberty, so that he could be held or subjected, against his will, to the performance of his 'obligation.'"* (Emphasis supplied.) Again, "The first step to create a condition of peonage is taken when the debtor or person agreeing to perform 'service or labor' *contracts that it may thereafter be coerced, against his will, by dominion over his person and liberty."* (Emphasis supplied.) In Peonage Cases, D.C., 136 F. 707, 708, Judge Treiber declared:

"Peonage, within the meaning of this law, is the holding of any person to service or labor for the purpose of paying or liquidating an indebtedness due from the laborer or employé to the employer, when such employé desires to leave or quit the employment before the debt is paid off. It is wholly immaterial *whether the contract whereby the laborer is to work out an indebtedness due from him to the employer is entered into voluntarily or not. The laws of the United States declare all such contracts null and void, and they cannot be enforced.* It is immaterial *whether such a contract is made in consideration of a pre-existing indebtedness, or for a loan made at the time the contract is made."* (Emphasis supplied.)

In Clyatt v. United States, 197 U.S. 207, 25 S.Ct. 429, 430, 49 L.Ed. 726, the Supreme Court takes the same view. Declaring that peonage may be defined as a "status or condition of compulsory service, based upon the indebtedness of the peon to the master," the court said:

*"Peonage is sometimes classified as voluntary or involuntary * * *. The one*

---

2 "(Criminal Code, Section 269.) Holding or returning persons to peonage. Whoever holds, arrests, returns, or causes to be held, arrested, or returned, or in any manner aids in the arrest or return of any person to a condition of peonage, shall be fined not more than $5,000, or imprisoned not more than five years, or both." Sec. 444, 18 U.S.C.A.

*exists where the debtor voluntarily contracts to enter the service of his creditor. The other is forced upon the debtor by some provision of law. But peonage, however created, is compulsive service,—involuntary servitude."* (Emphasis supplied.)

Then after further discussing peonage, the Supreme Court reversed the conviction and remanded the case because there had been no proof that the persons whom defendant was *charged with having returned to a condition of peonage had ever been in such a condition.* In Bailey v. Alabama, 219 U.S. 219, 220, 31 S.Ct. 145, 151, 55 L. Ed. 191, a case arising under Sec. 56, the court held invalid as imposing a condition of peonage, an Alabama Statute which authorized the conviction for fraud of a laborer who had signed a contract agreeing to work out a debt. In the course of the discussion, the court said:

"Peonage is a term descriptive of a condition which has existed in Spanish America, and especially in Mexico. The essence of the thing is compulsory service in payment of a debt. A peon is one who is compelled to work for his creditor until his debt is paid."

Other cases since, United States v. Reynolds, 235 U.S. 133, 35 S.Ct. 86, 59 L.Ed. 162, Taylor v. Georgia, 315 U.S. 25, 602 S.Ct. 415, 86 L.Ed. 615, United States v. Gaskin, 320 U.S. 527, 64 S.Ct. 318, have taken the same view. Bernal v. United States, 5 Cir., 241 F. 339, a decision by this court, with one member dissenting, is not to the contrary. The record as we have it is meager but it does contain threats by the defendant that a victim, *a Mexican woman,* would be turned over to the immigration officers and confined if she tried to leave before paying her debt. The opinion cites the Clyatt case, and the conviction was reversed as to the two others against whom no law was invoked. The evidence here makes it clear, I think, that no condition of peonage existed except as to the two girls whose fines were paid and who were taken from the penitentiary by the defendant with the understanding that they were to work the fine out at his place. As to the other girls, all that is made to appear is that the defendant advanced them moneys to buy clothes and threatened them if they tried to leave before they paid him back. *It is not claimed that they had agreed with him to work for him until the indebtedness was paid out, and thereby put themselves in a condition of peonage.* It

it claimed merely that the fact that he claimed they owed him and, so claiming, subjected them, by threats and putting in fear, to involuntary servitude, makes out a condition of peonage. I do not think so. The statute has been on the books for nearly 100 years. Its meaning and effect have become well defined and established. To interpret it now to cover any case of involuntary servitude except one which constitutes peonage is, I think, to do violence to its plain meaning and established construction. While, therefore, I concur in the affirmance on Counts 8 and 9, I dissent from the affirmance on the other counts.