**In re Charles W. GRAHAM, aka C. W. Graham, aka Charles William Graham, aka C. W. Graham, M.D., fdba Charles W. Graham, M.D., Ltd., P.C., fdba Operated Farm, Debtor.**

**Bankruptcy No. 81–04153.**

United States Bankruptcy Court,
N. D. Iowa, W. D.

June 25, 1982.

A. Frank Baron, Sioux City, Iowa, for Ms. Smith.

**236**

Rodney P. Kubat, Des Moines, Iowa, for Dr. Graham.

Donald H. Molstad, Sioux City, Iowa, for trustee.

Edward F. Samore, Sioux City, Iowa, Trustee.

*Findings of Fact, Conclusions of Law, and ORDER Denying Motion to Convert, with Memorandum*

WILLIAM W. THINNES, Bankruptcy Judge.

The motion of Patsy Jean Smith, formerly known as Patsy Jean Graham, to convert the Debtor's Chapter 7 proceedings to a case under Chapter 11 came before the Court for hearing. Testimony was received and argument was heard. The motion was taken under advisement in order to allow Ms. Smith and Dr. Graham an opportunity to submit briefs on the issue. The Court, being fully advised, now makes the following Findings of Fact, Conclusions of Law, and Order with Memorandum.

## FINDINGS OF FACT

1. Charles W. Graham, debtor/respondent, is a fifty-nine year old radiologist. He works at three hospitals, earning approximately $200,500 per year. Because of the traveling involved and his age, Dr. Graham intends to cut down on the number of hospitals he serves in the near future.

2. On June 5, 1980, the Cherokee County District Court granted Dr. Graham and Mrs. Graham, creditor/movant, (herein referred to as Ms. Smith) a dissolution of marriage. In the dissolution, Ms. Smith received the couple's 360-acre farm. The Steele State Bank held two mortgages on this farm; Steele Farms, Inc., also held two mortgages on it; and the Doupe Estate held a contract on it. Ms. Smith assumed the obligation on the contract, and Dr. Graham assumed the obligations on the mortgages.

3. In the same dissolution decree, Dr. Graham received a 1980 Eldorado.

4. In October 1980, Dr. Graham purchased a $135,000 residence.

5. On April 24, 1981, Dr. Graham filed a Petition under Chapter 7 of the Bankruptcy Code. Dr. Graham listed the Internal Revenue Service as the holder of $124,884.46 in disputed priority claims. Dr. Graham listed the General Motors Acceptance Corporation (hereinafter referred to as GMAC) as the holder of a $10,889.21 secured claim; he listed the First Federal Savings & Loan Association of Ida Grove, Iowa, as the holder of a $81,513.00 secured claim. GMAC held a purchase-money security interest in Dr. Graham's 1980 Eldorado. First Federal Savings held the mortgage on his residence. After amending his Petition on May 14, 1981, Dr. Graham listed four relevant unsecured creditors: the Steele State Bank with an estimated $252,145.00 claim; Steele Farms, Inc., with an estimated $98,600.00 claim; the Doupe Estate with an estimated $182,000.00 claim; and Ms. Smith with an estimated $475,000.00 claim. Dr. Graham claimed that his nonexempt property was worth only $97,338.96.

6. Subsequently, Ms. Smith moved to convert Dr. Graham's case from a Chapter 7 proceeding to a Chapter 11 proceeding.

7. Dr. Graham opposes such conversion, not wishing to be compelled to submit to the terms of a Chapter 11 Reorganization Plan.

## CONCLUSIONS OF LAW

1. The decision whether to convert a case to Chapter 11 is left to the sound discretion of the Court, based on what will most inure to the benefit of all parties in interest.

2. The appropriateness of an 11 U.S.C. § 706(b) conversion depends upon the general concerns of Congress when it adopted the Bankruptcy Reform Act of 1978.

3. In adopting the Bankruptcy Reform Act of 1978, Congress did not intend that individual debtors be compelled to submit to the terms of a repayment plan. Such a forced submission to a repayment plan would be the effect—assuming confirmation of, and compliance with, a reorganization plan—of an 11 U.S.C. § 706(b) conver-

sion from a Chapter 7 proceeding to a Chapter 11 proceeding.

## ORDER

IT IS THEREFORE ORDERED that the Motion of Patsy Jean Smith to Convert the Debtor's Bankruptcy proceedings, pursuant to 11 U.S.C. § 706(b), from a case under Chapter 7 of the Bankruptcy Code to a case under Chapter 11 of the Bankruptcy Code shall be, and the same is, denied and dismissed.

## MEMORANDUM

█ The matter before the Court is the Motion of Ms. Smith to convert the debtor's bankruptcy proceedings from proceedings under Chapter 7 of the Bankruptcy Code to proceedings under Chapter 11 of the Bankruptcy Code. Ms. Smith's Motion is filed pursuant to 11 U.S.C. § 706(b). That section states:

On request of a party in interest and after notice and hearing, the court may convert a case under this chapter [7] to a case under chapter 11 of this title at any time.

The decision whether a Chapter 7 proceeding should be converted, pursuant to this section, to a Chapter 11 proceeding is in the discretion of the court. A court's discretion is to be governed by what "will most inure to the benefit of all parties in interest." H.R.Rep.No.595, 95th Cong., 1st Sess. 380 (1977); S.Rep.No.989, 95th Cong., 2d Sess. 94 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5880, 6336.

█ The best interests of the debtor's creditors, especially the interest of his nonpriority, unsecured creditors, would be served by granting Ms. Smith's Motion.[1] The debtor is a highly skilled professional who earns over $200,000 a year in gross income. He suffers no known physical or mental impairment, and, although he is certainly not a young man, he has several years of peak earning power left before retirement. The Debtor, however, discounts such consideration entirely. He argues that his debts to the Internal Revenue Service, his normal business expenses, and his ordinary living expenses are such that very little of his gross income would remain after the payment of those debts to fund a reorganization plan that would provide any type of meaningful dividend to non-priority unsecured creditors and that, consequently, a workable plan that would provide a significant repayment of creditors' claims could not be formulated.[2] The question of the feasibility of any proposed reorganization plan, however, is better left to the confirmation process to decide. Furthermore, the Debtor's non-priority unsecured creditors, instead of contending themselves with a Chapter 7 liquidation where they stand to receive nothing in the way of a dividend, would still be better off in going through the confirmation procedure and attempting to get a plan of their own confirmed in the hopes of receiving some type of dividend on their claims.

The Debtor further argues that, even if a workable plan could be confirmed, he is considering cutting down the extent of his practice over the next several years, and, thus, there would be even less money to fund a plan. The short response to this contention is twofold. First, if the cutback of his workload is a genuine product of his increasing years, the Debtor's plan could be modified accordingly. *See* 11 U.S.C. § 1127(b). Second, if such a cutback is simply a product of a desire not to follow

---

1. The trustee's interest must be considered to be identical with that of the debtor's creditors, especially that interest of the debtor's nonpriority unsecured creditors whom the trustee has a statutory duty to represent. *See* H.R.Rep ·o. 595, 95th Cong., 1st Sess. 379 (1977); S.Rep. No.989, 95th Cong., 2d Sess. 93 (1978).

2. The Debtor maintains that, under the most generous of plans only $3,006.83 of his $200,-500 yearly gross income would be available for distribution among unsecured creditors. Moreover, he asserts that nonpriority unsecured creditors would not receive any distribution for nine years, due to the $124,884.46 priority claim of the Internal Revenue Service. According to the debtor, he would then need an additional eighteen years to pay just ten per cent of the non-priority unsecured claims pursuant to the plan.

the dictates of the plan, the debtor's petition can be dismissed and the debtor consequently denied the opportunity to receive a discharge. *See* 11 U.S.C. § 1112(b). The debtor does not suggest that he has a constitutional right to a discharge. His rights are statutory. If he does not wish to comply with the terms of the Bankruptcy Code, he can be left to nonbankruptcy methods of dealing with his financial difficulties.

The best interest of the Debtor, however, would be served by denying Ms. Smith's Motion. By receiving a bankruptcy discharge immediately, Dr. Graham would be free from the burden of substantial debt and would be able to obtain a fresh start immediately. *See* H.R.Rep.No.595, 95th Cong., 1st Sess. 125 (1977). He does not want to spend the last years before his retirement working to pay back his pre-petition creditors, especially Ms. Smith, who is his ex-spouse. Rather, he prefers to be free from such pre-petition financial burdens, obligated only upon the unpaid balance of the claim of the IRS, *see* 11 U.S.C. § 523(a)(1), and that portion of his debt to Ms. Smith that is nondischargeable pursuant to 11 U.S.C. § 523(a)(5).

Not surprisingly, therefore, the best interests of the debtor's creditors and of the debtor conflict. In determining what inures most to the benefit of *all* parties, the Court is left to consider legislative intent on the question whether individual debtors should be forced into repayment plans against their will. This policy consideration dictates that the Court deny Ms. Smith's Motion.

An order converting Dr. Graham's bankruptcy proceedings from Chapter 7 to Chapter 11 would have the effect, assuming a reorganization plan were subsequently confirmed and complied with, of diverting some of the fruits of Dr. Graham's future labors from himself to his pre-petition creditors. In essence, an 11 U.S.C. § 706(b) conversion might amount to an order to Dr. Graham to work for his pre-petition creditors and would thus be like a mandatory Chapter 13 proceeding. On the subject of mandatory Chapter 13 proceedings, Congress has stated:

> As under [the Bankruptcy Act of 1898], Chapter 13 is completely voluntary. The Committee [on the Judiciary] firmly rejected the idea of a mandatory or involuntary Chapter XIII in the 90th Congress. The thirteenth amendment prohibits involuntary servitude. Though it has never been tested in the wage earner context, it has been suggested that a mandatory chapter 13, by forcing an individual to work for creditors, would violate this prohibition. On policy grounds, it would be unwise to allow creditors to force a debtor into a repayment plan. An unwilling debtor is less likely to retain his job or to cooperate in the repayment plan, and more often than not, the plan would be preordained to fail.

H.R.Rep.No.595, 95th Cong., 1st Sess. 120 (1977) U.S.Code Cong. & Admin.News 1978, p. 6080 (footnotes omitted).

It is not clear whether Congress was correct in its assessment of the constitutional issue allegedly involved in a mandatory repayment plan under the Bankruptcy Code.[3] The Court, however, cannot ignore an explicit statement of congressional intent on a policy issue, and, as noted, Congress considers it "unwise to force a debtor into a repayment plan." H.R.Rep.No.595, 95th Cong., 1st Sess. 120 (1977), U.S.Code Cong. & Admin.News 1978, p. 6081. In the view of Congress, it is more important to encour-

---

**3.** The constitutionality under the thirteenth amendment of a mandatory repayment scheme under the Bankruptcy Code is not before the Court, and the Court does not purport to decide the issue. Such a mandatory repayment scheme is so radically different in character from the slavery that the thirteenth amendment was meant to abolish, however, that the Court questions whether the framers of that amendment had the prohibition of mandatory repay-

ment plans in mind when they drafted it. *See* A. Kelley & W. Harbison, *The American Constitution, Its Origins & Developments* 408–409 (5th Ed. 1976). It is important to note, however, that because of its misgivings concerning the constitutionality of forced repayment plans, it is unlikely that Congress intended individual debtors to be subject to 11 U.S.C. § 706(b) conversions to Chapter 11 proceedings.

age a debtor to retain his or her employment, instead of running the risk of a debtor's walking away from his or her job in order to avoid working to fund a repayment plan that primarily benefits someone else. Applying this policy to the facts of the instant case, it is better, for Dr. Graham, and presumably, for society, that Dr. Graham continue to service three hospitals instead of cutting back on his services because of an unwillingness to fund a Chapter 11 reorganization plan. In the view of Congress, it is also better to avoid the possible administrative difficulties involved in attempting to get a debtor to comply with a repayment plan, and to avoid the prospect of a bankruptcy court's presiding over a repayment plan that is preordained to fail, instead of attempting to enforce compliance with a mandatory repayment plan.[4]

Thus, the expressed legislative intent is that individual debtors should not be forced into a repayment plan against their will. Some members of Congress appear to be rethinking this policy,[5] but the Court must follow legislative intent as it is presently expressed.[6] The debtor, not surprisingly, has emphatically voiced his desire not to be compelled to submit to the terms of a Chapter 11 reorganization plan. Because the forced submission of the debtor to such a plan is the sole purpose of the Movant's motion to convert these proceedings from Chapter 7 to Chapter 11 and because the effect of such an 11 U.S.C. § 706(b) conversion would be such a forced submission, the Court is forced to deny the Movant's motion.

---

4. Compliance with a mandatory repayment plan would be encouraged by the threat of dismissal of the debtor's bankruptcy proceedings in the event that the debtor does not comply with the repayment plan. If the debtor's petition is dismissed prior to the completion of the repayment plan, the debtor will not have received a discharge and would once again be subject to the nonbankruptcy collection efforts of his creditors.

5. Congress is currently considering several proposals in the nature of a mandatory Chapter 13. 9 Bkr-L Ed, Legislative History § 81.9(8) (Lawy Co-op. Supp.1982).

6. In light of the unequivocal statement of congressional intent on the question whether individual debtors should be compelled to submit to a repayment plan, see H.R.Rep.No.595, 95th Cong., 1st Sess. 119 (1977), the Court is not certain why Congress failed to draft 11 U.S.C. § 706(b) to explicitly foreclose the possibility in the context of a conversion from a Chapter 7 proceeding to a Chapter 11 proceeding of an individual debtor being compelled to submit to the terms of a repayment plan. The Court can only conclude that, in drafting 11 U.S.C. § 706(b), Congress was primarily concerned with corporate debtors that had filed Chapter 7

petitions, that Congress momentarily lost sight of the fact, see 11 U.S.C. § 109(d), that individual debtors were also eligible for Chapter 11 relief, and that Congress, in light of its misgivings concerning the constitutionality and wisdom of forced repayment plans, could not have intended individual debtors to be subject to 11 U.S.C. § 706(b) conversions.

The Court is also aware that the Bankruptcy Code appears to subject individuals to the possibility of involuntary Chapter 11 proceedings, see 11 U.S.C. §§ 109(d), 303, 1112(a)(2). The question whether Congress actually intended to subject individual debtors to such a possibility in light of its misgivings concerning the constitutionality and wisdom of forced repayment plans is not before the Court, and the Court does not attempt to resolve it. The Court pauses to observe, however, that a reading of the legislative history indicates that Congress was thinking primarily, if not exclusively, of corporate, and not individual, debtors in the context of involuntary Chapter 11 proceedings. See H.R.Rep.No.595, 95th Cong., 1st Sess. 321–322 (1977) (reaffirming its disdain of forced repayment plans for individual debtors in the context of a discussion of the involuntary provisions of the Bankruptcy Code).