In re Derrick Dewayne
**GORDON, Debtor.**

**Proudfoot Consulting Company
(n/k/a Alexander Proudfoot
Company), Movant,**

v.

**Derrick Dewayne Gordon, Respondent.**

**No. 11–62509–WLH.**

United States Bankruptcy Court,
N.D. Georgia,
Atlanta Division.

Jan. 24, 2012.

---

60. 11 U.S.C. § 1327(a); *see also In re Okosisi,* 451 B.R. at 100.

61. 11 U.S.C. § 1327(b) & (c).

62. *In re Okosisi,* 451 B.R. at 99.

Sage M. Sigler, William Stewart Sugden, Alston & Bird LLP, Atlanta, GA, for Plaintiff/Petitioner.

Karen Fagin White (Lead), Bruce Z. Walker, Cohen Pollock Merlin & Small, Atlanta, GA, for Defendant/Respondent.

Donald F. Walton, United States Trustee, Guy G. Gebhardt, Assistant United States Trustee, Lindsay N.P. Swift, United States Department of Justice, Office of the United States Trustee, Sally Quillian

Yates, United States Attorney, Lena Amanti, Assistant U.S. Attorney, Atlanta, GA, Tracy J. Whitaker, Victor W. Zhao, United States Department of Justice, Washington D.C., for Intervenors.

## ORDER ON MOTION TO CONVERT CHAPTER 7 CASE TO ONE UNDER CHAPTER 11

WENDY L. HAGENAU, Bankruptcy Judge.

Proudfoot Consulting Company ("Proudfoot") filed a Motion to Convert Debtor's Chapter 7 Case to a Case under Chapter 11 of the Bankruptcy Code ("Motion to Convert") on August 12, 2011 [Docket No. 55]. The Debtor opposed the Motion on multiple grounds, including that any such conversion is unconstitutional, and a hearing on the same was held on September 8, 2011. The parties stipulated that the evidence submitted to the Court in connection with Proudfoot's Motion to Dismiss, which was heard on July 12, 2011, should be considered by the Court in connection with the Motion to Convert, together with all the matters of record in the referenced bankruptcy case. After service of notice of the constitutional question, the United States intervened in the case and filed a brief in support of the constitutionality of conversion, to which the Debtor responded further. After review of the same and the arguments of counsel, the court concludes the case should be converted to one under Chapter 11. The following are the Court's Findings of Fact and Conclusions of Law under Fed. R. Bankr.P. 7052.

## FINDINGS OF FACT

Mr. Gordon is an operational consultant who works internationally with companies to improve efficiencies in their organization. Mr. Gordon holds an MBA in Finance. Mr. Gordon is a former employee of Proudfoot, where he was its Vice President for business delivery in Europe. Mr. Gordon voluntarily left Proudfoot in June 2006. While Mr. Gordon was employed at Proudfoot, he was party to a written employment agreement which contained several restrictive covenants applicable for a period of six months following the conclusion of his employment. After Mr. Gordon left Proudfoot, he began working for Highland Consulting Group ("Highland"). On August 22, 2006, Proudfoot filed a suit against Mr. Gordon in Palm Beach County, Florida, which was then removed to the U.S. District Court for the Southern District of Florida. In April 2008, the District Court entered a judgment in favor of Proudfoot imposing injunctive relief against Mr. Gordon prohibiting him from working for Highland for a period of six months and also awarding Proudfoot $1,659,000.00 in damages. Subsequently, on September 15, 2008, the District Court entered an additional judgment in favor of Proudfoot and against Mr. Gordon in the amount of $335,050.55, for attorneys' fees and costs incurred by Proudfoot in the district court action. Mr. Gordon appealed the $1.6 million judgment to the Eleventh Circuit Court of Appeals. On July 30, 2009, the Eleventh Circuit Court of Appeals entered an order reversing the damages portion of the district court judgment but affirming the injunctive provisions of the judgment. Both parties filed motions seeking appellate attorneys' fees and costs in connection with this appeal, and the motions were remanded to the District Court for determination. Mr. Gordon also filed a Rule 60(b)(5) motion in the District Court seeking to vacate the portion of the District Court's judgment awarding the attorneys' fees of $335,050.55. The District Court initially vacated the attorneys' fees award to allow for further briefing, but ultimately reinstated the judgment as of February 25, 2011. Mr. Gordon appeal-

ed this decision of the District Court. Nevertheless, the judgment for $335,050.55 was not stayed and Proudfoot began garnishing Mr. Gordon's wages on April 14, 2011. Mr. Gordon then filed his Chapter 7 case on April 26, 2011 ("Petition Date"), noting his debts were not consumer debts. All legal fees in the bankruptcy case are being paid by Highland.

Mr. Gordon is married, but his wife is not a co-debtor and is not presently employed. Contemporaneously with the filing of this Chapter 7 bankruptcy case, Mr. Gordon filed his Schedules, Statement of Financial Affairs, Schedules I and J reflecting current income and expenses, certain payment advices and his Creditor Matrix. Mr. Gordon's schedules show secured debt of $413,163.00. Mr. Gordon and his wife own three rental condos, all of which are under water, a home which has little equity and a Jaguar. They also lease a Mercedes SUV. The unsecured debt evidenced on Mr. Gordon's schedules totals $412,109.55, including the $335,000.00 Proudfoot judgment. According to Mr. Gordon's schedules, the likely deficiency on the three condos is $33,230.00. Additionally, Chase Auto Finance stated in its Motion for Relief from Stay that the remaining amount due on the Mercedes is $4,500.00. Adding these potential deficiencies to the scheduled unsecured debt gives the Debtor a total possible unsecured debt of approximately $450,000.00. Mr. Gordon intends to retain his residence, which secures approximately $215,000.00 of debt. The Debtor and Proudfoot have continued to stipulate that Mr. Gordon's debts are business debts and not consumer debts. Relief from the automatic stay has been granted to two of the lenders on the rental condos owned by the Debtor, as well as to the holder of the lien on one of the Debtor's vehicles. The Debtor has filed a motion to reaffirm his debt with Chase Auto Finance for a Jaguar. No order approving the reaffirmation has been entered.

Much evidence was submitted regarding the amount of Mr. Gordon's monthly income. According to his Schedule I[1], his monthly income is $13,856.00 (which, multiplied by 12, is $158,232.00 a year). Mr. Gordon testified, however, his base salary is $250,000.00. He is also eligible for up to an additional $40,000 a year in bonuses but the bonuses are discretionary. His year-to-date income as of April 26, 2011 was $96,610.00 (which suggests average monthly income of $24,152.50), and his historical income was approximately $285,000.00 per year, including base salary and historical bonuses. Mr. Gordon defends his Schedule I by pointing out he receives his paychecks bi-weekly. Therefore, in most months he receives only two paychecks (the amount shown on Schedule I). Additionally, Mr. Gordon's position is that, because his bonuses are discretionary, he does not include those in his Schedule I income. Although Mr. Gordon is correct that he does not always have 1/12th of his income within a month, his Schedule I fails to take into account the additional two paychecks that he receives in the course of the year. The Court finds the minimum income Mr. Gordon expects is $250,000.00 a year, with it being extremely likely the actual income will be in excess of that amount. At the rate of $250,000.00 a year, the average monthly income is $20,833.00 per month.[2] This would increase the

---

1. As a non-consumer debtor, Mr. Gordon was not required to complete form 22A, so there are no "means test" numbers for the Court to assess.

2. Projected disposable income begins with a calculation of current monthly income. 11 U.S.C. § 1325(b)(2); 11 U.S.C. § 1129(a)(15)(B). Current monthly income is the average income of the debtor for the six-

monthly income on Schedule I by approximately $1,600.00. However, Mr. Gordon has indicated his intent to surrender the three condos and relief from the stay has already been granted as to two of them. His Schedule I includes $1,400.00 in rental income, which must then be eliminated in evaluating possible projected disposable income.[3] Therefore, the net difference in these adjustments to his Schedule I is negligible and, for purposes of the Court's analysis, the Court will accept the Debtor will have monthly net income of at least $13,846.00 on an average basis.

There is also conflicting evidence as to Mr. Gordon's expenses. On Schedule J, Mr. Gordon shows his monthly expenses as $13,446.00[4] for a net monthly income of $400.00. However, Schedule J includes payments on the rental property and the car to be surrendered of about $3,300.00. Schedule J also includes an expense of $2,800.00 for credit card payments, furniture bills and student loans, most of which would be discharged in this case. The evidence does not show how much of the $2,800.00 is for student loans, but the balance of the student loans is $4,400.00 so the monthly payment is a small part of the $2,800.00 allocated. Based on the surrender of the rental properties and the car alone, the Debtor's average monthly expenses decrease to $10,146.00.[5] The Court believes the actual amount of expenses will be significantly less, given the lack of repayment of the credit cards and the furniture loan. Mr. Gordon explained in his testimony that there were other expenses

he incurred which are not included in his budget, such as expenses for vacations and to assist his parents. Vacation expenses would not be appropriately included in the calculation of projected disposable income. There has been insufficient evidence for the Court to make any finding as to whether assistance to the parents is required, necessary or would be permitted as an allowable expense under the definition of projected disposable income. Based on the foregoing, the Court assumes expense of no more than $10,146.00 and finds that Mr. Gordon would have net monthly income of over $3,400.00 after surrender of the rental condos and the Mercedes. It is likely the net monthly income will be significantly higher with the payment of bonuses and the reduction of additional expenses.[6] The Court notes Proudfoot submitted its own recalculation of the Debtor's average monthly net income [Docket No. 77, Ex. D], which assumes a yearly income of $297,108.00 including bonuses. Proudfoot's calculation of current expenditures is $7,359.00, which results from the reductions in expenses the Court has recognized plus a reduction of the full $2,800.00 for the payments on the credit card, furniture loan and student loans. Under Proudfoot's analysis, it believes the Debtor could have as much as $10,038.00 in projected disposable income. The Court finds that Proudfoot's calculation is possible.

In addition to Mr. Gordon's projected disposable income, Mr. Gordon's remaining

---

month period preceding the filing. 11 U.S.C. § 101(10A). This average will include the "extra" paycheck the Debtor received because he is paid bi-weekly.

3. See *Hamilton v. Lanning*, —— U.S. ——, 130 S.Ct. 2464, 177 L.Ed.2d 23 (2010).

4. The Debtor's Schedule J includes payments on the debts secured by his house and car.

5. See *Hamilton v. Lanning*, —— U.S. ——, 130 S.Ct. 2464, 177 L.Ed.2d 23 (2010).

6. The Court is not making a finding as to the exact amount of the projected disposable income and that issue remains open for determination at the appropriate time.

assets are his house with a minimal amount of equity, the Jaguar on which he intends to reaffirm the debt, his 401(k) which is exempt, and a potential claim against Proudfoot for over $180,000.00 in attorney's fees in connection with the litigation between the parties. Mr. Gordon is not eligible to be a debtor under Chapter 13 because the amount of his unsecured debt exceeds the amount eligible under 11 U.S.C. § 109(e).

Proudfoot filed a Motion to Dismiss the case on June 12, 2011 under 11 U.S.C. § 707(a), noting that dismissal under Section 707(b) was not available since Mr. Gordon's debts were not primarily consumer debts. Mr. Gordon adamantly opposed the Motion to Dismiss and, after hearing evidence on July 12, 2011, the Court denied the Motion to Dismiss.[7] The parties have consensually extended the time through which Proudfoot can object to the Debtor's discharge under Section 727 or the dischargeability of the Proudfoot debt under Section 523 to February 29, 2012. In short, given Mr. Gordon's strong opposition to both the Motion to Dismiss and the Motion to Convert, Mr. Gordon wants to be in bankruptcy and receive a discharge, but only in a Chapter 7 proceeding.

## CONCLUSIONS OF LAW

Proudfoot has filed a Motion to Convert under 11 U.S.C. § 706(b), which provides, "[o]n request of a party in interest and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 11 of this title at any time." Mr. Gordon asserts that Section 706(b) was not intended to apply to individual debtors and the Court should so rule. Mr. Gordon urges that application of Section 706(b) to an individual debtor violates the Thirteenth Amendment of the Constitution as constituting involuntary servitude and violates the Anti–Peonage Act, 42 U.S.C. § 1994. Further, Mr. Gordon argues that, even if the application of Section 706(b) in an individual Chapter 7 case does not violate the Constitution or the Anti–Peonage Act, no grounds exist for conversion of this case. Proudfoot responds that individuals do not have a constitutional right to a discharge of debt and therefore denying a party the opportunity for a discharge of debt if the party does not make payments of his income is not involuntary servitude or a violation of the Anti–Peonage Act. Proudfoot also argues the irony of the Debtor's position that he is being involuntarily required to make payments on his debt, while at the same time strenuously objecting to any dismissal of his bankruptcy case which would, of course, relieve him of any obligations under Title 11. Proudfoot contends the preponderance of the evidence available in the record before the Court justifies the conversion of the case to one under Chapter 11. Both the Debtor and the Court certified and provided notice to the United States Attorney General that a constitutional question has been raised as required by 28 U.S.C. § 2403 and Fed. R. Bankr.P. 9005.1. After an extension of time, the Attorney General moved to intervene on December 6, 2011, which was granted on December 12, 2011. The Attorney General has also filed a Memorandum in support of the constitutionality of Section 706(b) and argues, *inter alia*, that the Debtor does not have standing to raise the constitutional issue and such is-

---

7. Since Mr. Gordon is not a consumer debtor, the Court could not dismiss the case as an abuse under Section 707(b). The legislative history of Section 707(a) is clear that a case may not be dismissed under Section 707(a) for ability to pay S. Rep No. 95–989, at 92 (1978). Moreover, the Debtor was in need of some bankruptcy protection as his wages were being garnished and he owned investment property that was under water.

sue is not ripe for determination. As discussed below, the Court should not address a constitutional challenge unless there is no other resolution of the issue. The Court will therefore first address the applicability of Section 706(b) to a non-consumer individual debtor, and then the question of whether, in the Court's discretion, the case should be converted to one under Chapter 11. Lastly, the Court will examine the constitutional challenge.

## APPLICABILITY OF THE STATUTE TO INDIVIDUAL NON–CONSUMER DEBTORS

■ Section 706(b) of the Bankruptcy Code clearly, on its face, applies to all debtors in Chapter 7. There are no limitations on conversion from Chapter 7 to Chapter 11 other than being eligible to be a debtor in the chapter. There is no dispute but that individuals are entitled to be debtors under Chapter 11 of the Bankruptcy Code. *See* 11 U.S.C. § 109(d) and 11 U.S.C. § 101(41). The Debtor urges the Court to read Section 706 to exclude individuals with primarily non-consumer debts because of certain legislative history surrounding Chapter 13. In *1977*, Congress expressed concern as to whether a mandatory or involuntary Chapter 13 would constitute involuntary servitude under the Thirteenth Amendment. The legislative history states further that "[o]n policy grounds, it would be unwise to allow creditors to force a debtor into a repayment plan." H.R. REP. No. 95–595, at 120 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6081. However, this legislative history is not directly related to Section 706(b), nor is it related to Chapter 11, and does not reflect anything about the "policy grounds" of Section 706(b). Further, as the Supreme Court made clear in the case on which Mr. Gordon relies, *Toibb v. Radloff,* 501 U.S. 157, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991), "[w]here, as here, the

resolution of a question of federal law turns on a statute and the intention of Congress, we look first to the statutory language and then to the legislative history if the statutory language is unclear." *Id.* at 161, 111 S.Ct. 2197 (quoting *Blum v. Stenson,* 465 U.S. 886, 896, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)). Where the language is not unclear, there is no need to refer to a statute's legislative history. In this case, the statute is eminently clear that it is not limited to corporate debtors and the Court therefore does not need to look at the legislative history of Chapter 13 in construing the statute.

Moreover, since 1977, Chapter 11 practice has developed substantially. The Supreme Court in *Toibb* resolved the dispute as to whether individual *non-business debtors* could be Chapter 11 debtors by holding they could. 501 U.S. at 166, 111 S.Ct. 2197; *see also In re Moog,* 774 F.2d 1073, 1075 (11th Cir.1985) (holding individual is eligible Chapter 11 debtor). The lower courts had generally allowed individual business debtors to file Chapter 11, but some courts (and the Supreme Court dissent) contended *consumer* debtors could not avail themselves of Chapter 11. There was little dispute about the availability of Chapter 11 to individual business debtors. Moreover, courts have concluded that an involuntary Chapter 11 petition may be filed against individuals. *See, e.g., In re Marciano,* No. CC–11–1008–DMkKi, 459 B.R. 27, (9th Cir. BAP 2011); *In re Diloreto,* No. 07–154136F, 2008 WL 141922 (Bankr.E.D.Pa. Jan. 11, 2008); *In re Oberle,* No. 06–41515, 2006 WL 3949174 (Bankr.N.D.Cal. Dec. 21, 2006). In 2005, when the Bankruptcy Code was extensively amended, Congress added 11 U.S.C. § 303(*l*) (now subsection k), providing certain protections for individuals in involuntary cases. Congress also amended 11 U.S.C. § 707(b) by requiring consent of

the individual debtor to convert to Chapter 13 or Chapter 11 in the event the court found a chapter 7 petition to be a substantial abuse, but only if the debtor's debts are primarily consumer debts. Despite the judicial history of individuals in Chapter 11 and amendments made to the Bankruptcy Code relating to individuals in Chapter 11, Congress did not add any limitation on the ability of the court to convert a Chapter 7 case of an individual with primarily non-consumer debts to one under Chapter 11.

■ Thus, the Court holds that Section 706(b) applies to a Chapter 7 case of an individual debtor with primarily *non*-consumer debts. The Court will therefore proceed to analyze whether this case should be converted under 11 U.S.C. § 706(b).

## BASIS FOR CONVERSION

■ Section 706(b) does not provide any specific requirements for converting a case to Chapter 11. In this regard, it is different from 11 U.S.C. §§ 1112 and 1307, which outline a number of possible "causes" for conversion of a case from a Chapter 11 to a Chapter 7, or from a Chapter 13 to a Chapter 7. Instead, conversion of a case under Chapter 7 to a case under Chapter 11 is left to the discretion of the Court. "The decision whether to convert is left in the sound discretion of the court, based on what will most inure to the benefit of all parties in interest." S. REP. NO. 95–989, at 940 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5880. Since there are no specific grounds for conversion, a court "should consider anything relevant that would further the goals of the Bankruptcy Code." *In re Lobera,* 454 B.R. 824, 854 (Bankr.D.N.M.2011).

A variety of relevant factors have been considered by courts. Some courts review the factors identified in 11 U.S.C.

§ 1112(b) in deciding whether to convert because, "[i]f cause exists to reconvert from Chapter 11 under § 1112(b), conversion from Chapter 7 under section 706(b) would be a futile and wasted act." *In re Ryan,* 267 B.R. 635, 638 (Bankr.N.D.Iowa 2001) (citing *In re Eugene Alexander, Inc.,* 191 B.R. 920, 924 (Bankr.M.D.Fla.1994)); *see also In re Home Network Builders, Inc.,* No. 06–3355, 2006 WL 3419791, at *3 (D.N.J. Nov. 22, 2006). Courts have also noted there is no requirement that a debtor have an ongoing business to be eligible for a Chapter 11 reorganization. *Id.* at 637. Some courts, however, look at whether there is a possibility of a confirmable plan. *In re Home Network Builders, Inc.,* No. 06–3355, 2006 WL 3419791, at *3 (D.N.J. Nov. 22, 2006). Other courts consider the purpose of a conversion and if the purpose is only to liquidate, which is more compatible with a Chapter 7 than a Chapter 11 case, conversion may not be appropriate. *See In re Watkins,* 132 B.R. 781, 782 (Bankr.S.D.Fla.1991). In each instance, though, the goal is to determine the benefits to all the parties.

■ Under the facts of this case, conversion of this case to one under Chapter 11 is in the best interest of all the creditors, as it will maximize the Debtor's estate. The Debtor argues the ability to pay should not be a factor in determining if conversion is appropriate but provides no support for that position. While it may not be the only factor to consider in deciding to convert a case, ability to pay is certainly *a* factor that may be used in evaluating the appropriate chapter in which a debtor should operate to obtain a discharge. Ability to pay is *a* factor in the totality of the circumstances analysis under 11 U.S.C. § 707(b)(3) and also *a* factor that can be considered under 11 U.S.C. § 707(a). The cases considering conversion to Chapter 11 begin the analysis with

the acknowledgment that the debtor can pay more in a Chapter 11 case than in a Chapter 7 case, which is a benefit to creditors. *See In re Graham,* 21 B.R. 235, 237 (Bankr.N.D.Iowa 1982); *In re Lobera,* 454 B.R. 824, 854 (Bankr.D.N.M.2011). Thus, the Court will consider the Debtor's ability to pay in determining whether conversion is appropriate.

As stated above, this Debtor has demonstrated a consistent ability to earn at a high level. The Debtor's monthly net income is at least $3,400.00, and perhaps as much as $10,000.00. The total unsecured debts in the case are approximately $450,000.00. Therefore, if the Debtor proposed a plan that provided for payment to creditors of an amount equal to his projected disposable income for five years, creditors could receive a distribution of approximately 45%–100%.[8] This factor weighs in favor of conversion.

Although Proudfoot is the creditor most aggressively pursuing the Debtor, the Debtor does have other unsecured creditors, and conversion of the case is of benefit to them as well. If the case were dismissed, it is likely that only Proudfoot would be able to obtain payment from the Debtor, as only Proudfoot appears to have the wherewithal and determination to chase the Debtor until it receives payment. Converting the Debtor's case to one under Chapter 11 and allowing the Debtor to file a plan allows for the other unsecured creditors, including the lenders holding deficiencies on the condos, to obtain a distribution.

Moreover, review of the identified "causes" under 11 U.S.C. § 1112 for conversion leads the Court to conclude a con-version back to Chapter 7 would not be immediately required. There is no evidence of substantial or continuing loss to or diminution of the estate or gross mismanagement of the estate. Based on the evidence presented to date, the Debtor has complied with all Court orders and reporting requirements of the Bankruptcy Code. The Debtor has attended his meeting of creditors under Section 341 as well as Rule 2004 examinations and depositions. With the Chapter 11 case only just beginning, the Court cannot conclude the Debtor has failed to file a disclosure statement or to confirm a plan or to effectuate substantial consummation of a plan or otherwise defaulted under a plan.

The next consideration for the Court is the likelihood the Debtor can confirm a plan in his Chapter 11 case. While the Debtor anticipates all the possible problems with confirmation, the Court declines to assume that Proudfoot will block any reasonable plan of reorganization or that any reasonable plan of reorganization could not be confirmed over Proudfoot's objection. As demonstrated above, the Debtor certainly has the ability to earn funds sufficient to make payments to his creditors. Moreover, the Court notes matters remain pending in the District Court litigation, both as to the Debtor's liability to Proudfoot for attorney's fees and the Debtor's claim against Proudfoot for his attorney's fees. The outcome of this litigation may also dramatically change the nature of a plan.

The courts analyzing conversion under Section 706(b) typically have no trouble finding conversion is in the best interest of the creditors. The more difficult question

---

8. This calculation assumes the projected disposable income is paid only to unsecured creditors because payment on the Debtor's secured debts is already included in the calculation. However, 11 U.S.C. § 1129(a)(15) only requires the amount of projected disposable income equal the "value of the property to be transferred under the plan" to all creditors, not just unsecured creditors. Compare 11 U.S.C. § 1325(b)(1)(B).

is whether conversion is in the best interest of the Debtor. Although this Debtor professes that conversion is not in his best interest, the Court notes this Debtor has become a pawn between two companies which have seen fit to manipulate this Debtor and ruin his credit, rather than resolve their issues. The bankruptcy is being funded by his present employer. Dismissal of this case will only result in further efforts by the two companies to thwart each other, using Mr. Gordon in the process. A final resolution of this matter is needed, so that Mr. Gordon can resume his normal life. Conversion is also beneficial to Mr. Gordon, because it avoids litigation over Section 727 issues of discharge and instead focuses litigation only on the potential non-dischargeability of the debt of Proudfoot under Section 523. If, as Proudfoot argues, its debt is non-dischargeable, a Chapter 11 plan will be a preferred method for dealing with payment of the debt.

Finally, the Court notes the Debtor is an individual, but one whose debts are almost exclusively business debts. Not only is the Proudfoot debt business related, but the deficiencies on his rental condos may also be business-related. Moreover, the credit card debt is largely related to either Mr. Gordon's work for Highland or his rental condos, according to his testimony. Mr. Gordon is *not* a consumer debtor. He is not subject to Section 707(b) and the means test or any other "consumer" provisions of the Bankruptcy Code. If he were, it is likely his case would have been dismissed under Section 707(b). But, under Section 707(a), the Court cannot dismiss a case for ability to pay alone. Conversion to Chapter 11 is an appropriate remedy provided by Congress for a non-consumer debtor with an ability to pay to avoid the same abuses of the bankruptcy system identified in the consumer area.

The facts of this case are different from the cases where the courts have refused to convert the case to one under Chapter 11. In *In re Ryan*, 267 B.R. 635 (Bankr. N.D.Iowa 2001), the court declined to convert a case to Chapter 11 based on a debtor's ability to pay because, under the status of the law at the time, the creditor did not have standing to move to dismiss the case on ability to pay grounds, and the court did not believe the creditor should be able to circumvent this restriction by moving to convert for the same reason. *Id.* at 638. The law has obviously changed and now, under 11 U.S.C. § 707(b), a creditor can move to dismiss for substantial abuse including ability to pay. In *In re Lenartz*, the court refused to convert because, under the law at the time, post-petition earnings were not property of the estate. 263 B.R. 331, 335 (Bankr.D.Idaho 2001). The court therefore did not see that a creditor could improve his position by the case being in Chapter 11. *Id.* Obviously, that is no longer the state of the law. *See* 11 U.S.C. § 1115. In *In re Watkins*, the court refused to convert to Chapter 11 because the only purpose of the conversion was liquidating a single asset, and the court held the administrative expenses would exceed the benefit of a Chapter 11 case. 132 B.R. 781, 782 (Bankr.S.D.Fla. 1991). In other instances, the court simply used its discretion based on the facts of the case in front of it to decide that conversion was not the best route for the case. *In re Graham*, 21 B.R. 235, 238 (Bankr. N.D.Iowa 1982); *In re Lobera*, 454 B.R. 824, 825 (Bankr.D.N.M.2011); *In re Home Network Builders, Inc.*, No. 06–3355, 2006 WL 3419791, at *4–5 (D.N.J.2006). In this case, the Court exercises its discretion to determine conversion of the case is appropriate.

## CONSTITUTIONAL CHALLENGE

Having found conversion is permitted under 11 U.S.C. § 706(b) and is appropri-

ate on the facts of this case, the Court now addresses the constitutionality of the statute as applied in this case. The Debtor's primary opposition to the Motion to Convert is the argument that an involuntary conversion to Chapter 11 would violate the Thirteenth Amendment prohibition on involuntary servitude. A challenge to the constitutionality of a statute is a serious evaluation and not one undertaken lightly. Article III of the Constitution limits the authority of the courts to determining only "cases and controversies" (U.S. CONST. ART. III, § 2). As such, the courts have developed a number of justiciability requirements to insure the judiciary's role is appropriately limited.

Throughout the development of constitutional law, the Supreme Court of the United States has crafted justiciability doctrines and canons of statutory interpretation for federal courts to carry out their constitutional and prudential responsibilities. Due to the "great gravity and delicacy in passing upon the validity of an act of Congress" in addition to concerns over the sensitive power of judicial review, the doctrine of constitutionality avoidance emerged.

*In re Clemente*, 409 B.R. 288, 293 (Bankr. D.N.J.2009) (quoting *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 345–48, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis concurring)) (citations omitted). The doctrines also conserve judicial resources and improve decision-making by providing concrete facts and issues for review. ERWIN CHEMERINSKY, CONSTITUTIONAL LAW PRINCIPLES AND POLICIES, 51 (Vicki Been et al. eds., 3rd ed. 2006).

 As the United States pointed out in its brief, one of the justiciability doctrines is ripeness, which "seeks to separate matters that are premature for review, because the injury is speculative and never may occur from those cases that are

appropriate" to be decided at that time. *Id.* at 103. "The ripeness doctrine protects federal courts from engaging in speculation or wasting their resources through the review of potential or abstract disputes." *Digital Props., Inc. v. City of Plantation*, 121 F.3d 586, 589 (11th Cir. 1997). In its ripeness evaluation, the Eleventh Circuit "assess[es] both the fitness of the issues for judicial decision and the hardship to the parties of withholding judicial review." *Harrell v. Florida Bar*, 608 F.3d 1241, 1258 (11th Cir.2010). The question of fitness addresses the "finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed." *Id.* (quoting *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 535 (1st Cir.1995)). The hardship question addresses the cost to the complaining party of delaying review until further facts have been developed. *Id.* "[T]he ripeness doctrine arises 'both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.' ... Only when a claim is not ripe within the meaning of Article III does a court lack jurisdiction over the subject matter." *In re Cassim*, 594 F.3d 432, 437–38 (6th Cir.2010) (quoting *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 58 n. 18, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993)) (citation omitted). The prudential aspect of ripeness allows the court to exercise its discretion to determine if resolution of the issue should be addressed at that time, given all of the circumstances. *Id.; see also In re Marciano*, 459 B.R. 27, 43 (9th Cir. BAP 2011).

 The Supreme Court in *U.S. v. Raines*, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960), further stated,

In the exercise of [Article III] jurisdiction, [the court] is bound by two rules, to which it has rigidly adhered: one, never

to anticipate a question of constitutional law in advance of the necessity of deciding it; the other, never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.... The delicate power of pronouncing an Act of Congress unconstitutional is not to be exercised with reference to hypothetical cases thus imagined.

*Id.* at 21, 80 S.Ct. 519 (citations omitted). Further, "[w]hen the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932).

■ With these concepts in mind, the Court will evaluate the Debtor's constitutional challenge to Section 706(b). First, it is clear the statute is not unconstitutional on its face. As the Supreme Court said in *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), "we need not find the language [of the statute] now before us constitutional in all its possible applications in order to uphold its facial constitutionality". *Id.* at 104, 91 S.Ct. 1790. The Debtor does not challenge the applicability of Section 706(b) to corporations and thus acknowledges that constitutional applications exist. Instead, the Debtor challenges the constitutionality of applying Section 706(b) to individuals with primarily non-consumer debts.

■ Since the Debtor challenges the application of Section 706(b) as being in violation of the Thirteenth Amendment's prohibition on involuntary servitude, the Court must examine the scope of involuntary servitude under the Thirteenth Amendment. The Supreme Court has recognized from its earliest decisions that the genesis of the Thirteenth Amendment was to prohibit slavery.

Slavery implies involuntary servitude,— a state of bondage; the ownership of mankind as a chattel, or at least the control of the labor and services of one man for the benefit of another, and the absence of a legal right to the disposal of his own person, property, and services. This amendment was said in the *Slaughter-House Cases,* [83 U.S. 36] 16 Wall. 36, 21 L.Ed. 394 [ (1872) ], to have been intended primarily to abolish slavery, as it had been previously known in this country, and that it equally forbade Mexican peonage or the Chinese coolie trade, when they amounted to slavery or involuntary servitude, the use of the word "servitude" was intended to prohibit the use of all forms of involuntary slavery of whatever class or name.

*Clyatt v. U.S.,* 197 U.S. 207, 218, 25 S.Ct. 429, 49 L.Ed. 726 (1905) (quoting *Plessy v. Ferguson,* 163 U.S. 537, 542, 16 S.Ct. 1138, 41 L.Ed. 256 (1896)). However, "courts have consistently found the involuntary servitude standard is not so rigorous as to prohibit all forms of labor that one person is compelled to perform for the benefit of another. The Thirteenth Amendment does not bar labor that an individual may, at least in some sense, choose not to perform, even when the consequences of that choice are 'exceedingly bad'." *Immediato v. Rye Neck School Dist.,* 73 F.3d 454 (2nd Cir.1996). The courts have recognized it is not involuntary servitude to require an attorney to work *pro bono* or to require a doctor who accepted scholarship funds to work *pro bono* or for the government to require individuals to serve in the military. *See id.* Finally, involuntary servitude generally requires compulsion, either through physical coercion or legal sanction. "[O]ur precedents clearly define a Thirteenth Amendment prohibition of involuntary ser-

vitude enforced by the use or threatened use of physical or legal coercion." *U.S. v. Kozminski,* 487 U.S. 931, 944, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988). Similarly, in *Brooks v. George Cnty., Miss.,* 84 F.3d 157 (5th Cir.1996), the court noted, "[w]hen the employee has a choice, even though it is a painful one, there is no involuntary servitude.... A showing of compulsion is thus a prerequisite to proof of involuntary servitude." *Id.* at 162 (quoting *Watson v. Graves,* 909 F.2d 1549, 1552 (5th Cir. 1990)).

The Debtor argues that converting his case from Chapter 7 to one under Chapter 11 is involuntary servitude because there is the potential for a number of provisions in Chapter 11 to be invoked. The Debtor points to the following specific possible ramifications of conversion:

(i) The debtor's post-petition earnings become property of the estate and must be used as necessary for execution of a confirmed plan. 11 U.S.C. §§ 1115, 1123(a)(8).

(ii) Under 11 U.S.C. § 1129(a)(15), if an unsecured creditor objects to a proposed plan, the debtor must show that the amount of his projected disposable income for at least five years is being paid under the plan.

(iii) The debtor has no absolute right to dismiss or convert his case pursuant to 11 U.S.C. § 1112 since the Chapter 11 case was not voluntarily selected by the debtor.

(iv) A creditor can propose a plan under 11 U.S.C. § 1121(c).

(v) The absolute priority rule may require the debtor to surrender his house and other personal possessions.

(vi) The court may find the debtor in contempt for failure to comply with any confirmed plan and such contempt may be punishable by fine or jail.

First, the Court notes that, with one possible exception, none of the items the Debtor sets out in the parade of horribles occurring from a conversion happen automatically from the conversion of the case. The only effect of converting the case under Section 706(b) is that the Debtor's post-petition earnings become property of the estate, which means that, if he wishes to use those post-petition earnings for non-typical purposes, a request for approval to spend the money must be filed with the Bankruptcy Court and the use must be approved. 11 U.S.C. § 363. Conversion to a Chapter 11 also means the Debtor must file certain operating reports with the U.S. Trustee and pay a U.S. Trustee's fee. But this is all that happens upon the conversion of the case. This is different from a Chapter 13 case where, merely upon the filing of the case, the debtor is required to begin making payments and must immediately file a plan with a minimum length of three years.

The other possible consequences of a Chapter 11 case raised by the Debtor are not ripe for consideration. The Debtor's concern that Proudfoot will file a plan requiring him to work is unfounded at this point. The Debtor will have an exclusivity period of at least 120 days within which to file a plan of reorganization, which period can be extended by the Court up to 18 months after conversion. 11 U.S.C. § 1121. There is no imminent risk that Proudfoot or any other creditor or party in interest will file a plan. The Debtor's fear that he will be required to pay his projected disposable income into the plan for five years has also not yet occurred. This requirement only arises under 11 U.S.C. § 1129(a)(15) if creditors have not otherwise accepted a plan of reorganization. To date, there is no plan, much less a lack of acceptance or an objection to the plan

requiring even consideration of this element. The Debtor argues payment of his projected disposable income for five years will happen with "virtual certainty" and in fact is the purpose of the Motion to Convert. There is no doubt that the Debtor's ability to make payments to his creditors is the primary reason for conversion of this case, but the conversion itself does not cause the payment to occur. The Debtor can continue to refuse to offer a payment plan to his creditors if he chooses, and the Court can decide what action to take at the time, based on the facts developed. Perhaps the Debtor's argument is really that it is a "virtual certainty" he will not propose a repayment plan. If so, that is the *Debtor's* decision, not the Court's, and the Debtor cannot complain about the consequences of that decision.

The Debtor argues he may be required under the absolute priority rule of 11 U.S.C. § 1129(b)(2)(B) to surrender his home or other property. Again, this issue would only arise if the Debtor's plan was not accepted by the creditors. There is no plan, no vote, and no absolute priority issue at this point. Furthermore, there are diverging opinions as to how the absolute priority rule is applied in an individual Chapter 11 case, and there is no controlling authority on that issue in the Eleventh Circuit at this time. Consideration of this concern is premature. Next, the Debtor posits that a failure to comply with a confirmed plan would lead to a finding of contempt punishable by fine or jail. Despite more than 28 years of practice, this Court has never seen a debtor held in contempt for failure to comply with a plan, much less fined or jailed. The most likely outcome when a debtor does not comply with the plan is a dismissal of the case. In any event, this hypothetical has not oc-

curred and any decision regarding it is not ripe. The Debtor argues he will have no right to convert the case back to one under Chapter 7 or to dismiss the case under 11 U.S.C. § 1112.[9] While the Debtor is correct he has no absolute right to either convert or dismiss the case, the Court retains discretion to either dismiss or convert the case at a later time. In fact, Proudfoot has sought dismissal of the Debtor's case, and the Debtor is the one who has objected to dismissal.

None of the foregoing "horribles" have occurred, and none will occur without other decisions by the Court. Following the Supreme Court justiciability doctrines, the Court concludes the constitutionality of these other sections of Chapter 11 as applied to an individual non-consumer debtor are not ripe for review since none are at issue at this time. Even if the matters are constitutionally ripe, they are not prudentially ripe since determining the issues would require the Court to assume many facts not in evidence and not even in existence at this time. There is no hardship to the Debtor in requiring he wait to litigate these issues only if and when they are presented. If and when a plan is presented that is not accepted by creditors and any of these issues arise, the Court can address them. The Debtor will preserve his argument as to the constitutionality of the application of these other provisions, so a delay in presenting the arguments to a time when the facts are developed is not harmful to the Debtor. *See Nebraskaland Inc. v. Sunoco, Inc.,* No. 10–1091, 2010 WL 5067962 (E.D.N.Y.2010). "[A] statute is not to be declared unconstitutional for all purposes just because someday, somehow, it might be unconstitutional 'as applied' in a particular case." *In*

9. Many courts hold there is no absolute right to convert from Chapter 13 to Chapter 7 either. *See In re Kotche,* NO. 10–30082, 2011 WL 4434931 (Bankr.D.Md. Sept. 22, 2011)

*re Higginbotham,* 111 B.R. 955, 967 (Bankr.N.D.Okla.1990).

 For similar reasons, the United States argues the Debtor does not have standing to challenge the constitutionality of Section 706(b). In order to show the Debtor has standing to raise a particular issue, the Debtor must show he has suffered an injury in fact, there must be a causal connection between the injury and the conduct complained of, and it must be likely, as opposed to speculative, the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The injury in fact must be "an invasion of a legally protected interest which is (a) concrete and particularized ... and (b) 'actual or imminent, not conjectural or hypothetical.'" *Id.* (citations omitted). The Debtor argues standing does not apply to an affirmative defense. However, the Debtor misapplies the cases cited. While certainly a defendant has standing to defend himself, the defense raised must still relate to the facts of the case and the injury allegedly sustained by the defendant. The overarching constitutional principle of not anticipating a constitutional question in advance of the necessity of deciding it, *U.S. v. Raines,* 362 U.S. at 21, 80 S.Ct. 519, would be violated if justiciability requirements were ignored because the issue was raised defensively. An affirmative defense of unconstitutionality must still relate to the alleged injury, which is concrete and imminent. Imminent harm means "likely to occur immediately". *Fla. State Conference of N.A.A.C.P. v. Browning,* 522 F.3d 1153, 1161 (11th Cir.2008), citing *31 Foster Children v. Bush,* 329 F.3d 1255, 1265 (11th

Cir.2003).[10] Furthermore, the justiciability requirements have both Article III and prudential concerns. Even if Article III standing is not implicated by the affirmative defense, prudential concerns continue to apply. *See Wooden v. Bd. Of Regents of Univ. Sys. of Ga.,* 247 F.3d 1262, 1273, n. 12 (11th Cir.2001)

 As discussed above, the Debtor has not suffered an actual injury, nor is injury imminent based merely on a conversion of the case to Chapter 11. Any potential injury to the Debtor would occur only as a result of subsequent actions taken by this Court in ruling on the various issues that may arise if and when a plan is proposed that is not accepted by the creditors. Therefore, the Debtor does not have standing at this time to challenge the constitutionality of sections of the Bankruptcy Code which are not now in issue and no creditor has sought to apply. Even if the Debtor has Article III standing, prudential concerns preclude the Debtor's standing to challenge the applicability of code sections not now in issue. The only question before the Court is whether conversion to Chapter 11 alone violates the Thirteenth Amendment.

 The Court concludes the mere conversion of the case from Chapter 7 to Chapter 11 is not a type of physical or legal coercion constituting involuntary servitude. As stated above, conversion does not require anything of the Debtor. Conversion does not require the Debtor to work for a particular employer, or in a particular job, or to work at all, nor does it require the Debtor to pay his creditors. Conversion simply places the Debtor in another chapter within the Bankruptcy

10. The Debtor asserts ripeness cannot be raised as an affirmative defense, but none of the cases cited by the Debtor involve the assertion of ripeness as a defense. Moreover, courts have ruled to the contrary. *See Marciano v. Fahs (In re Marciano),* 459 B.R. 27, 40 (9th Cir. BAP 2011).

Code, the protection of which the Debtor invoked by voluntarily filing his own petition to facilitate his discharge.[11]

■■■■■ Refusing to allow the Debtor a discharge under Chapter 7 is not involuntary servitude. The Court notes a party has no constitutional right to a discharge of its debts. *U.S. v. Kras,* 409 U.S. 434, 446, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973). The Debtor agrees with this proposition, but nevertheless argues he has a right to remain in Chapter 7 and obtain a Chapter 7 discharge. The Debtor, in effect, argues that conditioning a discharge on a successful Chapter 11 case by converting his case involuntarily, however, is involuntary servitude. Thus, he seems to argue that, if he wants a discharge, he has a constitutional right to obtain one under Chapter 7. That is not correct. A party has a statutory right to file bankruptcy, but then only pursuant to the terms of the statute. If he does not want to comply with all the requirements of the Bankruptcy Code, he may not get a discharge. Refusing a debtor a discharge may have the practical effect of making a debtor address the debts *he incurred.* A creditor may seize property or garnish wages [12], but no one requires the debtor to work or places him in jail for failure to pay. The consequences he faces are those of his own creation—he will continue to owe his creditors.

> A clear distinction exists between peonage and the voluntary performance of labor or rendering of services in payment of a debt. In the latter case, the debtor, though contracting to pay his indebtedness by labor or service, and subject, like any other contractor, to an action for damages for breach of that contract, can elect at any time to break it, and no law or force compels performance or a continuance of service.

*Clyatt v. U.S.,* 197 U.S. 207, 215–16, 25 S.Ct. 429, 49 L.Ed. 726 (1905).

The court in *In re Herberman,* 122 B.R. 273 (Bankr.W.D.Tex.1990), considered arguments similar to the Debtor's at a time when the courts were wrestling with whether post-petition income of an individual in a Chapter 11 case should be considered property of the estate. The court noted that an individual debtor could refuse to accept "appointment" as debtor in possession, 11 U.S.C. § 1104, at which point the court would likely appoint a trustee. The court commented the debtor would "be under no legal compulsion to work for the trustee." *Id.* at 284.

> The involuntary debtor could also justifiably argue that he simply does not desire to work for the estate, and that neither a trustee nor the court can make him, based on the Thirteenth Amendment, and the court could do little but accede. However, the court also could no longer leave the debtor in possession under such circumstances, and would likely have sufficient cause to mandate the appointment of a trustee. That is simply an economic consequence flowing from the debtor's decision, no more remarkable than suffering a judgment for breach of contract for breaking an employment agreement.... The debtor always has the keys to the shackles. Economic necessity may discourage him from freeing himself, but is hardly the

---

**11.** The Court does not hold the Debtor has waived any Thirteenth Amendment rights by the filing of the bankruptcy case.

**12.** Garnishment of wages has been held to not violate the Thirteenth Amendment to the Constitution. *See Beltran v. Cohen,* 303 F.Supp. 889, 893 (N.D.Cal.1969); *Vickroy v. Rockwell Intern. Corp.,* 100 F.3d 966 (9th Cir.1996) 1996 WL 654388 (unpublished decision). In each instance, the determining factor was that the debtor chose to continue employment.

equivalent a law of force compelling performance or continuance of service in violation of the Constitution.

*Id.* at 284–85 (citations omitted). As the court in *Brooks* said, when the party has a choice, even though it is a painful one, there is no involuntary servitude. 84 F.3d 157. The bankruptcy court in *In re Higginbotham,* 111 B.R. 955 (Bankr. N.D.Okla.1990) noted that, while "[a]n 'unwilling' debtor's plan may not succeed, ... why should discharges be granted to debtors who are able but 'unwilling' to pay their just debts? ... [W]ithholding a ... discharge does not force a debtor to work" and does not violate the Constitution. *Id.* at 963. Because the conversion of the case to Chapter 11 in and of itself does not require the Debtor to work or to pay any of his debts under pain of physical coercion or legal sanction, the Court concludes that converting a Chapter 7 case of an individual debtor with primarily non-consumer debts to one under Chapter 11 does not violate the Thirteenth Amendment of the Constitution.

### ANTI–PEONAGE ACT

 Next, the Debtor argues that converting his case to one under Chapter 11 would violate the Anti–Peonage Act, 42 U.S.C. § 1994. The Supreme Court in *Clyatt v. U.S.* defined "peonage" as the "status or condition of compulsory service, based upon the indebtedness of the peon to the master." 197 U.S. at 215, 25 S.Ct. 429. The Supreme Court noted that peonage differs from voluntary labor in payment of a debt because in peonage the party cannot release himself from his obligation to work. Where a debtor can cease working, peonage does not exist because the debtor can breach the obligation to work and be subject to damages, but is not under legal or physical coercion to work. *Id.* at 215, 25 S.Ct. 429. In the cases where the Supreme Court has struck a

statute as violating the Anti–Peonage Act, the repercussion for the failure to work was a criminal sanction. For example, in a trio of cases, *Bailey v. Alabama,* 219 U.S. 219, 31 S.Ct. 145, 55 L.Ed. 191 (1911), *Pollock v. Williams,* 322 U.S. 4, 64 S.Ct. 792, 88 L.Ed. 1095 (1944), and *Taylor v. Georgia,* 315 U.S. 25, 62 S.Ct. 415, 86 L.Ed. 615 (1942), the court struck down statutes that made it a crime for a party to fail to complete work they had agreed to perform. In addition to the criminal element in each of these cases, these statutes in the post-reconstruction south all placed evidentiary burdens on the defendant being able to testify.

 As in the discussion regarding the constitutionality of Section 706(b), the Court finds the only matter ripe for decision is the effect of mere conversion of the case from Chapter 7 to Chapter 11, and not whether any of the "horribles" described by the Debtor might, under certain circumstances, violate the Anti–Peonage Act. Since, again, the mere conversion of the case from one under Chapter 7 to one under Chapter 11 does not require the Debtor to work for a particular employer, or at a particular job, or to work at all nor to pay anyone, the conversion itself does not violate the Anti–Peonage Act.

### AUTHORITIES CITED BY DEBTOR

The cases cited by the Debtor in support of his position that conversion of an individual non-consumer debtor's case from Chapter 7 to Chapter 11 constitutes involuntary servitude are distinguishable. First, they do not actually rule on the constitutional or Anti–Peonage Act issue. Instead, the cases rely on the legislative history surrounding the enactment of Chapter 13 and Congress' expressed concern about *whether* a mandatory repayment plan would violate the Thirteenth Amendment. *See In re Graham,* 21 B.R.

235 (Bankr.N.D.Iowa 1982); *In re Freunscht,* 53 B.R. 110 (Bankr.D.Vt.1985); *In re Brophy,* 49 B.R. 483 (Bankr.D.Haw. 1985); *see also In re Noonan,* 17 B.R. 793 (Bankr.S.D.N.Y.1982) (refusing to convert individual case to Chapter 11 where sole purpose was to have debtor assume personal services contract which was not assumable. Court declined to rule on constitutional issues.) As the court in *In re Lenartz* stated, "[t]o the extent that *Graham, Brophy* and *Freunscht* attempt to ignore the plain language of Section 706(b) in favor of implementing an intent by Congress not made explicit in the statutes, this Court must respectfully disagree with those decisions." No. 01–40268, 2001 WL 35814401 at *2 (Bankr.D.Idaho 2001). The court in *Lenartz* also noted that Congress had not seen fit to limit the right to file an involuntary Chapter 11 petition against an individual, even though the issues raised by *Graham, Brophy* and *Freunscht* had been pending for almost 20 years. *Id.*

Despite the frequent recitation by courts of the legislative history regarding Chapter 13, the Court has found no case holding that an involuntary Chapter 13 case or mandatory Chapter 13 program would invoke involuntary servitude, or that an involuntary Chapter 11 invokes involuntary servitude. The Supreme Court did not do so in *Toibb,* but simply pointed out one distinction between Chapter 13 and Chapter 11 as it existed at the time (postpetition income as property of the estate) in declining to reach the constitutional issue. *Toibb v. Radloff,* 501 U.S. 157, 167, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991). In no way did the Supreme Court in *Toibb* indicate that an involuntary individual Chapter 11 would constitute involuntary servitude or that making post-petition income property of the estate turns a Chapter 11 case into involuntary servitude for individuals. *Id.*

Moreover, there are additional distinctions between Chapter 11 and Chapter 13 that may distinguish Congress' concern in a Chapter 13 case from this case. In Chapter 13 cases, a debtor is required to file a plan immediately, 11 U.S.C. § 1321, while in a Chapter 11 case, a debtor may file a plan at any time and the exclusivity period can be extended for 18 months. 11 U.S.C. § 1121. In a Chapter 13 case, the debtor must begin making payments within 30 days of the petition date, 11 U.S.C. § 1326(a)(1), while in a Chapter 11 plan, the timing of payments is governed by the plan, 11 U.S.C. § 1123. In Chapter 13, a plan must last a minimum of three or five years based on the applicable commitment period, 11 U.S.C. § 1322, while there is no minimum or maximum term for a Chapter 11 plan. In Chapter 13, a trustee is appointed to oversee the plan process and its consummation, 11 U.S.C. § 1302, while in Chapter 11, the debtor is presumptively a debtor in possession. 11 U.S.C. § 1107.

> There is a tendency to look at the changes to chapter 11 and assume that the only difference for individuals between chapter 13 and chapter 11 is the debt limitations. This might lead one to conclude that the new chapter 11 provisions are really a subspecies of chapter 13. However, that would be problematic and likely wrong. There are some significant differences between chapter 11 and chapter 13.

Bruce A. Markell, *Symposium: Consumer Bankruptcy & Credit in the Wake of the 2005 ACT: The Sub Rosa Subchapter: Individual Debtors in Chapter 11 after BAPCPA,* 2007 U. Ill. L.Rev. 67, 79 (2007). These differences can further explain Congress' concern (both on constitutional and policy bases) about an involuntary Chapter 13 case.

The Debtor relies heavily on *In re Clemente,* 409 B.R. 288 (Bankr.D.N.J.2009),

which discusses both the Thirteenth Amendment and anti-peonage issues. However, the *Clemente* decision was not evaluating the constitutionality of 11 U.S.C. § 706(b) but instead 11 U.S.C. § 1112(a) which limited the right of the debtor to re-convert his case. Given the constitutional issues raised and the justiciability doctrines discussed above, the court removed the Chapter 11 trustee (which was the sole barrier to the debtor's right to convert) to allow the debtor to convert the case to Chapter 7 and then re-appointed the Chapter 7 trustee. Thus, while the issues are similar, they are not the same, the court did not rule any statute unconstitutional, and the case is not directly on point. In the case of *In re Lobera*, No. 7–10–13203, 2011 WL 941331 (Bankr.D.N.M. Mar. 16, 2011), also cited by the Debtor, the court did not address the constitutional or anti-peonage issue at all, but based its decision entirely on the facts.

On the other hand, several cases have acknowledged the right of the court, in its discretion, to convert a case from Chapter 7 to Chapter 11. *See In re Texas Extrusion Corp.*, 844 F.2d 1142, 1161 (5th Cir. 1988) (affirming a bankruptcy court's decision to re-convert a corporate Chapter 7 case back to Chapter 11); *In re Lenartz*, No. 01–40268, 2001 WL 35814401, at *3 (Bankr.D.Idaho May 3, 2001) (concluding that, "[g]iven the plain language of Section 706(b), and the fact that individual debtors can be forced into Chapter 11 by creditors initiating an involuntary petition", a creditor has standing to request that a debtor's Chapter 7 case be converted to Chapter 11); *In re Lobera*, 454 B.R. 824, 853 (Bankr.D.N.M.2011) (request to convert was denied, but based on facts and not inability of court to convert). Thus, after reviewing all the cases cited by both parties and located in its independent research, the Court concludes that none of the cases have ruled conversion under Sec-

tion 706(b) violates the Thirteenth Amendment of the Constitution or the Anti–Peonage Act. Rather, the courts have either based a decision not to convert on the facts of the case, or on the legislative history of Chapter 13 and the courts' understanding of the role of Chapter 11 in individual cases in the 1980s.

Moreover, the Court notes some unique facts in this case: First, this Debtor is a business debtor and not a consumer debtor. His debts are *not* primarily consumer debts. Some of the cases from the early 1980s regarding involuntary servitude were not very concerned with what happened to a *business* debtor in a Chapter 11, but were concerned about forcing consumer debtors with consumer debts into a particular chapter. Secondly, the Debtor's fees are being paid by his employer. No financial harm occurs to the Debtor from a conversion to Chapter 11. Third, the Court notes this Debtor has opposed a motion to dismiss and therefore has voluntarily not only filed his initial petition but stayed in the bankruptcy case despite the objections raised to his goal of discharge without payment. Thus, the Debtor is not opposed to bankruptcy protection, just opposed to making payment on his debts.

## CONCLUSION

The Court concludes 11 U.S.C. § 706(b) permits the Court to convert an individual non-consumer debtor's case from Chapter 7 to Chapter 11 and the act of conversion alone does not violate the Thirteenth Amendment to the Constitution as involuntary servitude or the Anti–Peonage Act. Many of the issues which the Debtor identifies as potential constitutional violations have not yet occurred, may not occur, and would only occur on subsequent order of the Court. Therefore, the Debtor's challenge to the applicability of certain provisions in Chapter 11 to an individual non-

consumer debtor are not ripe for decision, and the Debtor does not have standing to raise them at this time. Finally, the Court recognizes it may be rare that the proper use of discretion permits conversion of an individual Chapter 7 case to an individual Chapter 11 case. As the legislative history for Chapter 13 recognized, even if an involuntary case is constitutional, it may not be wise under most circumstances as a policy matter. However, the Court believes the facts of this case are unique as set out above and, in this case, at this time, conversion of this case to Chapter 11 is appropriate.

The Court's conversion of the case does not mean the Court would not entertain a motion to dismiss or convert at some later point, nor does it mean the Court has drawn any conclusion as to how some of the confirmation issues raised by the parties would be resolved, nor whether Proudfoot's debt is non-dischargeable. Rather, it is the Court's conclusion that a Chapter 11 format provides the best mechanism for a full and final resolution for Mr. Gordon of the Proudfoot debt, as well as the other debt remaining. The Court will enter a separate order of conversion.